

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-20-2001

# Ross v. Hotel Employees

Precedential or Non-Precedential:

Docket 00-3142

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Ross v. Hotel Employees" (2001). *2001 Decisions.* Paper 212.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/212

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 17, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3142

GEORGE A. ROSS,
        Appellant

v.

HOTEL EMPLOYEES AND
RESTAURANT EMPLOYEES
INTERNATIONAL UNION;
ROBERT BAKER, Co-Trustee;
CAROL CARLSON, Co-Trustee

Appeal from the Judgment of
the United States District Court
for the Western District of Pennsylvania
Civil Action No. 98-cv-01131
Magistrate Judge: Francis X. Caiazza

Argued: September 14, 2000

Before: ROTH, McKEE and RENDELL, Circuit Judge s

(Opinion filed: September 17, 2001)

        THOMAS M. CASTELLO, ESQ.
         (Argued)
        Plunkett & Cooney, P.C.
        3000 USX Tower
        600 Grant Street
        Pittsburgh, PA 15219
        Attorney for Appellant


        RICHARD L. STOPER, Jr., ESQ.
         (Argued)
        SUSAN L. GRAGEL, ESQ.
        Rotatori, Gragel & Stoper CO., L.P.A.
        1040 Leader Building
        526 Superior Avenue, East
        Cleveland, Ohio 44114
        Attorneys for Appellees

OPINION OF THE COURT

McKEE, Circuit Judge.

We are asked to review the district court's grant of summary judgment in favor of Hotel Employees and Restaurant Employees International Union ("HEREIU"), and Robert Baker and Carol Carlson; and against plaintiff George Ross. Ross sued under Title III of the Labor Management Reporting and Disclosure Act of 1959. For the reasons that follow, we will affirm.

I. Factual and Procedural Background[1]

George Ross is a member of Local 57, a subordinate labor organization of HEREIU. Before January 6, 1998, Ross had been an elected non-salaried member of the Executive Board of that Local as well as an appointed full time salaried employee holding the title of business agent.[2]

On September 5, 1995, the United States entered into a Consent Decree with HEREIU. The Consent Decree appointed a federal monitor "for the remedial objective of relieving HEREIU and Local 57 from the direct or indirect influence of any organized crime group or the threat of such an influence." App. At 104. Sometime during the summer of 1997, the United States Department of Justice began investigating organized crime's relationship with

_____

1. The procedural history of this appeal is rather unique as the district court entered summary judgment after declaring a mistrial.

2. At all times relevant to the issues before us, Ross held an appointed office.

Local 57. Thereafter, the federal monitor brought charges of corruption involving several officers of Local 57 including Louis Sanfilippo, President; Nancy Davis, Secretary-Treasurer; Vince Fera, Recording Secretary; and Louis Masco, a union member.

At the same time this investigation was proceeding, a power struggle erupted between Local 57's "power base" and three of the other officers of the Local: Ross, Nassan and Brown.[3] Ross and Brown were then business agents of Local 57, and Nassan was a general organizer. According to Ross, the power struggle progressed to the point that the Local's Executive Secretary, Nancy Davis,[4] asked the International to assume control of Local 57 by establishing a trusteeship.

In November of 1997, the federal monitor also requested

that a trusteeship be established based on the charges brought against the officers of Local 57. Eventually, Robert Baker was appointed as the first of two Trustees who assumed control of Local 57.5 On the same day he was appointed, Baker fired Nassan, Ross and Brown; and Sanfilippo resigned. However, Nassan, Ross and Brown were rehired within 24 hours of their firing after complaining to the monitor.

An election for officers of Local 57 was scheduled for March 1998, but the Trustees canceled the election, and suspended the Local's constitution and by-laws. In April of 1998, Ross, Nassan and Brown filed the first of two lawsuits challenging HEREIU's right to impose a trusteeship. They named HEREIU and the two Trustees as defendants (the "Trusteeship case"). The plaintiffs asserted that, "[g]iven the resignation of Sanfilippo and the failure of HEREIU or the Trustees to suspend Nancy Ross, it is clear

_____

3. Inasmuch as we are reviewing a grant of summary judgment against Ross, we must assume that the allegations of his amended complaint are true, and draw all inferences which reasonably arise from those assertions in his favor as the nonmoving party. Woessner v. Air Liquide Inc., 242 F.3d 469, 471 (3d Cir. 2001).

4. Nancy Davis is also referred to as Nancy Ross in the record, as she is George Ross' former wife.

5. Carol Carlson was appointed as co-trustee about four weeks later.

3

that the continuation of the Trusteeship is improper and therefore must be dissolved." Ross' Complaint atP 26 (No. 98-629). The plaintiffs sought declaratory and equitable relief under Title III of the Labor Management Reporting and Disclosure Act of 1959 (the "LMRDA") which governs the creation and maintenance of trusteeships by labor organizations. See 73 Stat. 519 SS 301-01 (1959), 29 U.S.C. SS 461-66 (1998 & Supp. 2000) The prayer for relief included a request that the court dissolve the Trusteeship, reinstate the constitution and by-laws of Local 57, and order immediate elections. The plaintiffs also moved for a TRO to enjoin the Trustees from running Local 57's operations. That motion was denied. At the end of April, Nassan and Brown withdrew from the lawsuit, leaving Ross as the only plaintiff.6

During the summer of 1998, the Trustees decided to hold new elections and terminate the Trusteeship. They also issued new election guidelines under which Ross became

ineligible to run for office because his union dues were delinquent. Ross argues that these guidelines were specifically intended to remove him as an eligible candidate.[7] In addition to the new election guidelines, the Trustees also "proposed a new Constitution which terminated George Ross' position as full time salaried business agent." Ross' Amended Complaint at P 38 (No. 98-629).

In July of 1998, Ross filed a second lawsuit against the same defendants in state court (the "election case"). Ross sought a declaration that he was an eligible candidate for the upcoming election, and an injunction to prevent the election from proceeding until his eligibility could be determined. That suit was removed to federal court on motion of the defendants, and the district court thereafter refused to enjoin the election. Ross was not permitted to

_____

6. Ross argues that Nassan "cut a deal" with HEREIU and the Trustees to dissolve the Trusteeship, and hold elections in exchange for Nassan withdrawing from the lawsuit and his support of Ross.

7. In support of this argument, he points out that he had been elected to the Executive Board of Local 57 on three prior occasions even though his dues were then delinquent. Inasmuch as we are reviewing a grant of summary judgment, we must accept this argument as true.

4

run for office because of the aforementioned eligibility restrictions. On the day of the election, Ross, Nassan and Brown received letters terminating their employment as business agents. As a result of the election, Nassan was elected president and principle officer. After the swearing in of the new officers of the union, the Trusteeship was dissolved. Ross was not re-appointed as a business agent by the newly elected officers.

In December of 1998, the defendants filed a motion for summary judgment in the Trusteeship case. They argued that Ross' claim for equitable relief had been rendered moot by the election of new officers and the resulting dissolution of the Trusteeship. Ross answered arguing that the crux of the Trusteeship case was that the Trusteeship had been imposed in bad faith to remove political opposition. He insisted that all actions carried out pursuant to the Trusteeship were void. In February of 1999, Ross filed an amended complaint in the Trusteeship case alleging continuing harm and asking the district court to:

> Void the following actions taken in conjunction with
> that Trusteeship:

     i.  The suspension of the Local By-Laws and
     Constitution;

     ii.  The firing of the Plaintiff, George Ross on
     January 6, 1998;

     iii. The imposition of the new eligibility
     requirements to run for elected office intended to
     exclude George Ross as a candidate for the July,
     1998 elections;

     iv. The firing of George Ross on August 10, 1998.

Ross' Amended Complaint, P 9 (No. 98-629). He also
requested temporary reinstatement, scheduling of new
elections, monetary damages, counsel fees, and costs.

The district court consolidated Ross' two lawsuits and the
matter was scheduled for trial. Essentially, Ross contended
that he was harmed in two respects as a result of the
improper continuation of the Trusteeship. He alleged that
he had suffered damages as a result of being declared

5

ineligible to run for office in the August 1998 elections. He
also alleged damages as a result of the termination of his
appointed position as a business agent. Prior to trial, the
defendants filed a motion in limine seeking to exclude
evidence or argument regarding Ross' purportedly improper
exclusion from the August election. The court denied that
motion but did enter an order precluding Ross from
"seek[ing] any relief which would effect a change in the
union election." Ross v. Hotel Employees and Restaurant
Employees Int'l Union, No. 98-1131, slip. op. at 9 (W.D. Pa.
Oct. 4, 1999).

After both sides rested in the ensuing trial, the jury
reported that it was deadlocked and the court declared a
mistrial. However, before the scheduled retrial was to begin,
the defendants moved for summary judgment on all of
Ross' claims. The defendants argued that Ross was
precluded from asserting an individual claim for monetary
damages under Title III of the LMRDA. Ross opposed the
motion by relying solely on the law of the case doctrine. He
contended that the court had already implicitly decided
that an individual could sue for damages under Title III
because the court sent the damage suit to the jury in the
first trial.

The district court rejected Ross' law of the case argument

stating: "the issue of whether Title III supports Ross's individual requests for relief has not yet been adjudicated by the Court." Ross v. Hotel Employees and Restaurant Employees Int'l Union, No. 98-1131 slip. op. at 12 (W.D. Pa. Jan. 12, 2000). The court noted that Ross had not asserted a timeliness challenge, and concluded that it had broad discretion to entertain the defendants' motion for summary judgment even though the issues had been submitted to a jury. Id. at 6 (citing In re Sch. Asbestos Litig., 977 F.2d 764, 794 (3d Cir. 1992)). The court ultimately held that interests of judicial economy counseled in favor of adjudicating the summary judgment motion and granted summary judgment in favor of the defendants and against Ross.

In doing so, the court relied on the text and legislative history of the LMRDA as well as relevant precedent from other circuit courts of appeals. The court held that Ross' claims were all individual in nature and that Title III of the

6

LMRDA does not allow plaintiffs to seek individual relief. Id. at 12-13, 16-17. Rather, the district court concluded that Title III was intended to protect local unions, not their individual members. Id. at 14. The court relied in large part upon Gesink v. Grand Lodge, International Ass'n of Machinists and Aerospace Workers, 831 F.2d 214 (10th Cir. 1987), in stating:

> the purposes listed in Title III as justifying the creation of a trusteeship have nothing to do with protecting union members' or employees' individual rights; rather, they seek to protect locals from `corruption' or `financial malpractice' of their agents and to ensure that such agents comply with their obligations and `otherwise carry [ ] out the legitimate objects of ' the union.

Ross, slip. op. at 12. The court concluded that Ross' claim was not appropriately brought under Title III because each form of requested relief was intended to compensate him, not his Local.

> Plaintiff 's requests for lost wages, medical insurance coverage, and other `out of pocket costs' associated with his termination as business agent, as well as his request for reinstatement, are asserted on his own behalf and for his own benefit, not for that of Local 57.

Id. at 16-17. The district court did acknowledge that Ross sought other equitable relief including a declaration that the Trusteeship was improperly imposed in bad faith and

the voiding of certain of the Trustee's actions. Id. at 17 n.3.8
_____

8. The district court also discussed Ross' repeated attempts to invalidate the August 1998 election despite its previous ruling that Ross was barred from seeking to effect a change in the election. The district court reaffirmed its previous ruling that it lacked jurisdiction to entertain this
part of Ross' claim. Ross v. Hotel Employees and Restaurant Employees Int'l Union, No. 98-1131 slip. op. at 7-8 (W.D. Pa. Jan. 12, 2000). The court reasoned that Title IV of the LMRDA vests the Secretary of Labor with exclusive jurisdiction over an individual union member's post-election suits regardless of when members first seek relief regarding elections. See id. at 8-10 (citing Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley, 467 U.S. 526, 541, 544 (1984)). Post-election relief to invalidate elections
or seek new elections must first be pursued with the Secretary of Labor. Id. at 11 n. 2. Therefore, Ross "[was] barred from pursuing claims requiring an invalidation of the August 1998 election." Id. at 10-11.

7

However, inasmuch as that relief was ancillary to Ross' primary attempt to redress his individual injuries, Ross' entire case was dismissed. This appeal followed. 9

II. Jurisdiction and Standard of Review

The district court had jurisdiction pursuant toS 304 of the LMRDA. 73 Stat. 519 S 304, 29 U.S.C. S 464. We have jurisdiction from the district court's final order granting summary judgment under 28 U.S.C. S 1291. We exercise plenary review. Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland, 205 F.3d 615, 626 (3d Cir. 2000).

III. Discussion

Ross' appeal presents two questions for resolution. First, we must determine if Ross has waived the arguments he makes now because he did not raise those arguments in opposition to the defendants' summary judgment motion in the district court. If we address the merits of his claim we must decide the very important question of whether Title III of the LMRDA affords Ross a cause of action under the circumstances of this case.

A. Waiver

As noted above, Ross' opposition to the defendants' motion for summary judgment in the district court was limited to his contention that the law of the case precluded

summary judgment because the merits of his claim had been submitted to a jury. The district court disagreed with his position, and that ruling has not been appealed. On appeal, for the first time, he argues the merits of the defendants' claim that Title III of the LMRDA does not provide a cause of action for individual relief.

Generally, "absent compelling circumstances an appellate court will not consider issues that are raised for the first time on appeal." Patterson v. Cuyler, 729 F.2d 925, 929 (3d

_____

9. Ross does not now challenge the district court's denial of his assertion
that the law of the case precluded entry of summary judgment, or the district court's refusal to overturn the union's election.

8

Cir. 1984), overruled on other grounds recognized in Carter v. Rafferty, 826 F.2d 1299 (3d Cir. 1987) (citing Singleton v. Wulff, 428 U.S. 106, 120–21 (1976)). In Patterson, we explained:

> This prudential policy seeks to insure that litigants have every opportunity to present their evidence in the forum designed to resolve factual disputes. By requiring parties to present all their legal issues to the district court as well, we preserve the hierarchical nature of the federal courts and encourage ultimate settlement before appeal. It also prevents surprise on appeal and gives the appellate court the benefit of the legal analysis of the trial court. It is however not a jurisdictional bar, and the statement of policy permits exceptions in appropriate cases.

Id. (citations omitted).

The case at bar has important implications for the field of labor law, and raises a question of first impression in this circuit. Moreover, the procedural posture also raises procedural questions that we have not previously addressed. As noted above, the summary judgment motion was made after a jury deadlocked and a mistrial was declared. However, because of that unique procedural posture, the defendants can hardly claim at this late date that Ross' assertion of a private cause of action under Title III is a surprise, or that Ross' position prejudices them. They have obviously assumed that he had a private cause of action under Title III throughout the course of this litigation including trial. Although Ross failed to respond to the merits of defendants' arguments in the summary

judgment motion, the district court was afforded the rare advantage of a fully developed record in analyzing the issues raised by the motion for summary judgment. Inasmuch as the defendants are not unfairly prejudiced by the lateness of Ross' arguments, and given the importance of the issues raised by this grant of summary judgment, we think it appropriate to resolve this appeal on the merits, and not upon the procedural grounds that the defendants argue in the alternative.

Moreover, the district court did not err in considering a motion for summary judgment after a mistrial. If there are

no issues of material fact and a party is entitled to judgment as a matter of law, judgment may be awarded at any time, even after trial, under Rule 56 or under Rule 50. There was no reason to require the court to go through the procedural calisthenics of a second trial merely because the motion for judgment was brought after the mistrial. Accordingly, we will consider the merits of the arguments before us.

B. Title III of the LMRDA

This dispute arises in the context of a trusteeship that was imposed pursuant to Title III of the LMRDA. 10 The

_____

10. Title III of the LMRDA provides in relevant part:

 S 302 Purposes for which a trusteeship may be established

Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.

S 303 Unlawful acts relating to labor organization under trusteeship

(a) During any period when a subordinate body of a labor organization is in trusteeship, it shall be unlawful (1) to count the vote of delegates from such body in any convention or election of officers of the labor organization unless the delegates have been chosen by secret ballot in an election in which all the members in good standing of such subordinate body were eligible to participate . . .

* * *

S 304 Enforcement

(a) Upon the written complaint of any member or subordinate body of
a labor organization alleging that such organization has violated the
provisions of this title (except section 301) the Secretary shall
investigate
the complaint and if the Secretary finds probable cause to believe that
such violation has occurred and has not been remedied he shall, without
disclosing the identity of the complainant, bring a civil action in any

10

LMRDA defines a trusteeship as "any receivership . . . or
other method of supervision or control whereby a labor
organization suspends the autonomy otherwise available to
a subordinate body under its constitution or bylaws." 73
Stat. 519 S 3(h), 29 U.S.C. S 402(h). Title III limits the
establishment of trusteeships as follows:

> `Trusteeships shall be established and administered
> . . . for the purpose of [1] correcting corruption or
> financial malpractice, [2] assuring the performance of
> collective bargaining agreements or other duties of a
> bargaining representative, [3] restoring democratic
> procedures, [4] or otherwise carrying out the legitimate
> objects of such labor organization.

73 Stat. 519 S 302, 29 U.S.C. S 462. Specifying proper
purposes protects the local union organization and its
membership as a whole from the misuse of the trusteeship

_____

district court of the United States having jurisdiction of the labor
organization for such relief (including injunctions) as may be
appropriate. Any member or subordinate body of a labor organization
affected by any violation of this title (except section 301) may bring a
civil action in any district court of the United States having
jurisdiction
of the labor organization for such relief (including injunctions) as may
be
appropriate.

* * *

(c) In any proceeding pursuant to this section a trusteeship established
by a labor organization in conformity with the procedural requirements
of its constitution and bylaws and authorized or ratified after a fair
hearing . . . shall be presumed valid for a period of eighteen months from
the date of its establishment and shall not be subject to attack during

such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 302. After the expiration of eighteen months the trusteeship shall be presumed invalid in any such proceeding and its discontinuance shall be decreed unless the labor organization shall show by clear and convincing proof that the continuation of the trusteeship is necessary for a purpose allowable under section 302. In the latter event the court may dismiss the complaint or retain jurisdiction of the cause on such conditions and for such period as it deems appropriate.

73 Stat. 519 SS 301, 302, 303, 304, 29 U.S.C.SS 461, 462, 463, 464.

power. Title III provides that a trusteeship is"presumed valid for a period of eighteen months . . . and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 302." 73 Stat. 519 S 304(c), 29 U.S.C. S 464(c). The provision also states: "[a]ny member or subordinate body of a labor organization affected by a violation of this title may bring a civil action in any district court . . . for such relief (including injunctions) as may be appropriate." 73 Stat. 519 S 304(a), 29 U.S.C. S 464(a). It is this provision that provides the proverbial "rub" here, as we must determine if the individual relief that Ross is seeking is "appropriate" under Title III.11

Our inquiry is therefore circumscribed by our interpretation of this statute.

> In any case turning on statutory interpretation, our goal is to ascertain the intent of Congress. To accomplish this goal, we begin by looking at the statute's language. If the language is plain, we need look no further. If the statutory language is ambiguous or unclear, we may look behind the language to the legislative history for guidance.

_____

11. At oral argument, and vaguely in his brief, Ross argued that we should read the enforcement section of Title III in light of S 401 which is
the introduction section of the LMRDA and discusses the purposes and policy of the LMRDA. S 401(b) discusses protecting the rights of employees and the public in general:

> The Congress further finds, from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual

employees, and other failures to observe high standards of
responsibility and ethical conduct which require further and
supplementary legislation that will afford necessary protection of
the
rights and interests of employees and the public generally as they
relate to the activities of labor organizations, employers, labor
relations consultants, and their officers and representatives.

73 Stat. 519 S 2(b), 29 U.S.C. S 401(b). Ross contends that this section's
use of the word "employees" indicates that protecting employees of the
union was the underlying purpose of the LMRDA. For reasons we
discuss below, we disagree.

12

Collinsgru v. Palmyra Bd. of Educ., 161 F.3d 225, 233 (3d
Cir. 1998). The intricate legislative history of the LMRDA
has caused the Supreme Court to note that:

Archibald Cox, who actively participated in shaping
much of the LMRDA, has remarked:

`The legislation contains more than its share of
problems for judicial interpretation because much of
the bill was written on the floor of the Senate or
House of Representatives and because many sections
contain calculated ambiguities or political
compromises essential to secure a majority.
Consequently, in resolving them the courts would be
well advised to seek out the underlying rationale
without placing great emphasis upon close
construction of the words.'

Wirtz, 389 U.S. at 468 n.6 (citing Cox, Internal Affairs of
Labor Unions Under the Labor Reform Act of 1959, 58
Mich. L. Rev. 819, 852 (1960)). Thus the practice of
interpreting ambiguous statutory language in light of its
legislative history is of particular value in the context of the
LMRDA. Although we do not consider the word
"appropriate" an ambiguous term in and of itself, to the
extent that the text of the LMRDA does not adequately
define the term in context, and thereby definitively
establish what remedies are "appropriate" under Title III,
we are compelled to consult the statute's legislative history.
See West Virginia Univ. Hospital, Inc. v. Casey, 499 U.S. 83,
98 (1991) (it is appropriate to resort to legislative history to
determine the meaning of ambiguous legislation). The
legislative history of Title III confirms our analysis.

C. The Legislative History of Title III

In 1957, the Select Committee on Improper Activities in

the Labor Management Field of the United States Senate, more commonly known as the "McClellan Committee," began investigating and gathering findings on the internal affairs of labor unions. Note, Landrum-Griffin and the Trusteeship Imbroglio, 71 Yale L.J. 1460, 1473 (1962) (hereinafter "Note, Trusteeship Imbroglio"). The McClellan Committee's findings "exposed the details of the sad state of

13

democracy in large sections of the labor movement and provided numerous examples of the abuses of the trusteeship power." Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347, 357 n. 8 (1998) (quoting Note, Trusteeship Imbroglio at 1473).

> The Labor-Management Reporting and Disclosure Act of 1959 was the product of congressional concern with widespread abuses of power by union leadership. The relevant provisions of the Act had a history tracing back more than two decades in the evolution of the statutes relating to labor unions. Tensions between union leaders and the rank-and-file members and allegations of union wrongdoing led to extended congressional inquiry. As originally introduced, the legislation focused on disclosure requirements and the regulation of union trusteeships and elections. However, various amendments were adopted, all aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution; not surprisingly, these amendments-- ultimately enacted as Title I of the Act, 29 U.S.C. SS 411-415--were introduced under the title of "Bill of Rights of Members of Labor Organizations." The amendments placed emphasis on the rights of union members to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in turn loss of livelihood. Such protection was necessary to further the Act's primary objective of ensuring that unions would be democratically governed and responsive to the will of their memberships.

Id. at 352 (citing 105 Cong. Rec. 6471-6472, 6476, 15530 (1959)).

Title III of the LMRDA, the trusteeship title, first emerged as Title II12 of the Kennedy-Ives Bill passed by the Senate in

12. A review of the Senate Report no. 187, April 14, 1959 [To accompany S. 1555] in the Section-By-Section Analysis reveals that Title I was

originally the reporting provision and Title II was the trusteeship provision. U.S. Code Cong. & Admin. News at 2352 – 2362. Later, Title I became the Bill of Rights provision, Title II became the reporting provision and Title III became the trusteeship provision. 73 Stat. 519 S1 et seq., 29 U.S.C. S 401 et seq.

June of 1958. Lynn, 488 U.S. at 357 n.8. It appeared again in January of 1959 in the Kennedy-Ervin Bill. Id.; Note, Trusteeship Imbroglio at 1475. The Kennedy-Ervin Bill focused on disclosure and reporting requirements, trusteeships and elections. U.S. Code Cong. & Admin. News at 2318-72; Lynn, 488 U.S. at 352. The accompanying Committee Report to the Kennedy-Ervin Bill reflects the overarching concern of guaranteeing internal union democracy while minimizing governmental interference with the internal affairs of unions. See, e.g., 1959 U.S.C.C.A.N. at 2322-23; Jerry E. Linde, Title III of the Labor or Management Relations and Disclosure Act: For Greater Judicial Protection of Union Democracy and Local Automony, 9 J. Corp. L. 271, 276-80 (1984); Marcia Greenblatt, Union Officials and the Labor Bill of Rights, 57 Fordham L. Rev. 601, 601-02 (1989). This report acknowledged that trusteeships had been effective in the past "to insure order within [labor] organizations." U.S. Code Cong. & Admin. News at 2333. However, it also acknowledged the McClellan Committee's findings regarding the misuse of the trusteeship authority. The Committee Report noted:

> in some instances trusteeships have been used as a means of consolidating the power of corrupt union officers, plundering and dissipating the resources of local unions, and preventing the growth of competing political elements within the organization.

Lynn, 488 U.S. at 357 n. 8 (quoting 1959 U.S.C.C.A.N. at 2333). The Committee Report also explained why then current law was ineffective:

> A trusteeship will ordinarily be set aside unless the local is given a fair hearing including notice of the charges and an opportunity to defend. But if the forms of fair procedure are observed there appears to be little the courts can do and there are very few cases staying or upsetting trusteeships upon substantive grounds. Men have frequently been subjected to fines as large as $1,000 for bringing suit against a union; others have been expelled from the membership.

> The Committee on Labor and Public Welfare therefore concurs in the select committee's recommendation that

there should be a `limitation on the right of internationals to place local unions in trusteeship.'

U.S. Code Cong. & Admin. News at 2333.

The Kennedy-Ervin Bill underwent seven months of rewriting and debate involving several amendments. Note, Trusteeship Imbroglio, at 1475. A major alteration was the addition of a "Bill of Rights of Members of Labor Organizations." Id. The Bill of Rights"was adopted as an amendment on the Senate floor by `legislators[who] feared that the [original] bill did not go far enough because it did not provide general protection to union members who spoke out against union leadership.' " Lynn, 488 U.S. at 352 (quoting Steelworkers v. Sadlowski, 457 U.S. 102 (1982)). Those legislators believed this Bill of Rights was needed to further protect the rank-and-file members and reinforce the other provisions of the LMRDA, including the trusteeship provision.

In these debates, Senator McClellan stated:

I do not believe that racketeering, corruption, abuse of power and other improper practices on the part of some labor organizations can be, or will ever be, prevented until and unless the Congress of the United States has the wisdom and the courage to enact laws prescribing minimum standards of democratic process and conduct for the administration of internal union affairs. I mean by that, . . . that the Congress should prescribe and define by law what the rights of union members are, place in them by democratic process the power to secure those rights and protect them in their efforts to do so from reprisals of any kind from their would-be exploiters, manipulators, and bosses. Without such protection, other provisions of law may be of little benefit and meaningless. Without such protection in the exercise of his legitimate rights the records of our committee's investigations show over and over again that a rank-and-file member dare not risk any opposition to a corrupt or autocratic leadership. If he does so, he may be beaten, his family threatened, his property destroyed or damaged, and he may be forced out of his job--all of these can happen and have happened.

> Having these things in mind, . . . I introduced S. 1137
> to provide a bill of rights for working people--for union
> members.

105 Cong. Rec. 6471-72 (emphasis added).

The Bill of Rights was therefore "[d]esigned to guarantee
every member equal voting rights, rights of free speech and
assembly, and a right to sue." Lynn, 488 U.S. at 352
(quoting Steelworkers v. Sadlowski, 457 U.S. 102 (1982)).

Between January and September of 1959, when the
LMRDA was finally enacted, most of the debate concerned
the new additions and amendments, "while the trusteeship
title glided quietly through the labyrinthine process from
bill to bill with little change and less discussion." See Lynn,
488 U.S. at 357 n.8 (quoting Note, Trusteeship Imbroglio at
1475). Neither the discussions on the House nor Senate
floors focused on the relationship between Title I and Title
III. Id. Senator Dodd, however, did propose an amendment
to Title III which sparked some debate. Specifically, Dodd
wanted the trusteeship provisions to go even further in
order to prevent the manipulation of the trusteeship power
and the resulting harm that had been so well documented
by the McClellan Committee. Note, Trusteeship Imbroglio at
1475-76. Dodd's amendment created a presumption that
trusteeships in place longer than thirty days were invalid
unless the international union, at a hearing before the
Secretary of Labor, could present clear and convincing
proof of a proper purpose. Id. Senator Dodd explained the
rationale for his proposed amendment as follows:

> The [Kennedy-Ervin] bill now provides a procedure
> under which an individual union member may appeal.
> The point is that the full burden of proof is placed
> upon such union member, who thus would have to
> fight the international or the national union; and in
> that fight the limited, sparse, or -- most often--
> nonexistent power of the individual union member
> would be pitted against the tremendous prestige and
> power of the national or the international union. . . .
>
> the philosophy behind my amendment is an old Anglo-
> American philosophy . . . that the burden of proof for
> so serious a matter as destroying a local union, or local

17

> union autonomy -- and that is what a trusteeship
> usually does -- should rest upon the national union
> seeking to impose the trusteeship.

105 Cong. Rec. at 6675.

Dodd then focused on the importance of protecting the local membership given organized crime's entanglement with certain elements of the labor movement as unearthed during the congressional inquiry. He explained:

> In the past, as we know from the revelations of the McClellan committee, and as we know from litigation, the imposition of trusteeships was one of the greatest abuses of the Teamsters Union. My recollection is that more than 120 trusteeships were imposed by that union some of them for more than 20 years. Think of it. For more than 20 years, the local members, the wage earners, were without any say at all with respect to their local unions.

* * *

> All I seek by the amendment is to give the members of a local union an opportunity to say to someone, a judge, or other competent authority, `This trusteeship should not be imposed on us.'

Id. (emphasis added).

Senator Ervin opposed Dodd's amendment. Ervin argued "the bill as now drawn furnishes adequate protection for the rank and file of members of unions which are placed in trusteeship."[13] Id. at 6677. Additionally, Senator Morse argued:

> [W]e should look at the trustee section of the bill as it comes to us in the light of the other sections of the bill, and note what the committee has done by way of

_____

13. Part of Ervin's discussion specifically explained that the bill "takes care of the main reason why trusteeships are sometimes arbitrarily imposed, namely, to enable international officers to control the selection of delegates to international conventions. The bill contains a specific provision to the effect that the local union in trusteeship may be represented at an international convention only by delegates elected by a secret ballot of the members of the local." 105 Cong. Rec. 6677.

> setting up democratic procedures to protect the rank and file of the local unions. As we provide democratic guarantees in the bill, I believe we should keep at a minimum any interference with the operation of the

> internal affairs of the union.

Lynn, 488 U.S. at 357 n. 8 (quoting 105 Cong. Rec. 6678). Dodd's amendment was subsequently rejected.

When the Kennedy-Ervin Bill went to the House, the enforcement section of the trusteeship title was changed.14 The Kennedy-Ervin Bill did not grant individual union members standing to bring suit in federal court. The Committee Report accompanying the bill explained that "section 206 makes clear that Federal suits under Title II are possible only upon suit initiated by the Secretary of Labor." U.S. Code Cong. & Admin. News 1959, p. 2363. The enforcement section which Congress passed, and which is still in force, allows the local union itself or an individual union member to bring suit in federal court. See 73 Stat. 519 S, 29 U.S.C. S 464.

The legislative history is silent on the issue of whether a union member, as an appointed officer, may seek individual damages. However, Congressman Ludwig Teller offered supplementary views regarding the reasoning behind the amendment of the enforcement section. Teller explained that Congress wanted to facilitate individual claims without any involvement by the Secretary. U.S. Code Cong. & Admin. News 1959, p. 2500. This allowed Congress to curtail the inordinate power of the Secretary while saving taxpayer dollars and eliminating any requirement that a union member first obtain governmental permission to sue.15 Id.

_____

14. The enforcement provision currently in force is S 304 of the LMRDA, 29 U.S.C. S 464.

15. Congressman Teller stated:

> HR 8342 is a substantial improvement over S. 1555 (the Kennedy-Ervin bill), the Senate-passed labor management reform bill which our committee used as a basis for its deliberations.. . . Reducing the excessive powers of the Secretary of Labor, as we did in our committee bill H.R. 8342, is in line with our traditions which favor

This expansive discussion of legislative history does not conclusively establish what type of relief is "appropriate" for an individual union member who is also an appointed official. However, it places that inquiry into its proper context and guides our interpretation of the relevant statutory language. In interpreting Title III in the context of

the discussions in Congress and the findings of the McClellan Committee, we conclude that the amendment authorizing individual law suits was intended to underscore the concerns surrounding trusteeships under Title III. By allowing individual members to bring suit rather than the Secretary, Congress intended more avenues for enforcement of the trusteeship provision, not more types of relief.

Nothing in the legislative history of Title III suggests that Congress contemplated an individual bringing suit for compensatory damages arising from the loss of an appointed union position under that title. The statutory scheme of the LMRDA strongly suggests that the individual rights that Ross seeks to vindicate must be redressed under Title I. As noted above, that provision was initially referred to as the "workers' bill of rights" when it was introduced. Title III, which came first, was meant to protect the subordinate labor organization, and Title I was subsequently added specifically to address the rights of individual union members. Accordingly, we conclude from the legislative history that the relief that Ross seeks is not "appropriate" under Title III. An examination of the relevant cases confirms this conclusion.

D. Applicable Case Law

We have not previously interpreted S 304, the enforcement provision of Title III. However, Finnegan v. Leu, 456 U.S. 431 (1982), and its progeny guide our analysis. In

_____

> the diffusion of power, will save the taxpayer many millions of dollars annually without impairing the basic objectives of the proposed law, and will permit individuals to prosecute their own cases in the courts without having to obtain permission of a Government agent or official to do so.

U.S. Code Cong. & Admin. News 1959, p. 2500.

20

Finnegan, Leu defeated Brown in an election for president of Local 20 of the International Brotherhood of the Teamsters. Id. at 433. Brown had been openly supported by a group of the local's business agents including Finnegan. Id. After Leu assumed office, he discharged all of the business agents who had supported Brown pursuant to a provision in the local's bylaws that purported to give the president the "authority to appoint, . . and discharge the Union's business agents." Id. at 433. The business agents then sued in district court contending that their termination violated Title I of the LMRDA.16 Id.

The Court began its analysis by reviewing the legislative history of the LMRDA, and concluding that "the Act's primary objective [was] ensuring that unions would be democratically governed and responsive to the will of their memberships." Id. The Court noted that"[i]t is readily apparent from the legislative history of Title I, that it was rank-and-file union members--not union officers or employees, as such--whom Congress sought to protect." Id. at 437. The plaintiffs were members of the union with protected speech rights, as well as salaried employees of the union. Accordingly, the Court had to determine whether the rights afforded plaintiffs as members of the union "immunized [them] from discharge at the pleasure of the president from their positions as appointed union employees." Id.

The Court concluded that the plaintiffs' Title I rights had not been violated because plaintiffs had not been precluded from exercising any of those rights, and the LMRDA did not protect appointed officers who "backed the wrong horse." This was true even if it meant that those officers were "forced to `choose between their rights of free expression . . . and their jobs.' " Id. (citations omitted). The Court explained its rejection of plaintiffs' Title I claim as follows:

> For whatever limits Title I places on a union's authority to utilize dismissal from union office as `part of a

_____

16. The suit was filed under LMRDA SS 101(a) (1) and (2) which "guarantee equal voting rights, and rights of speech and assembly, to `[e]very member of a labor organization.' " Id. at 436 (quoting 29 U.S.C. S 411 (1998)).

21

> purposeful and deliberate attempt . . . to suppress dissent within the union,' (citations omitted), it does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own. Indeed, neither the language nor legislative history of the Act suggest that it was intended to address the issue of union patronage. To the contrary, the Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections.

Id. at 441.

Here, Ross also held the "dual status" of union member

and appointed union officer. Defendants argue that because Ross was employed during the entire time the trusteeship was in place, Finnegan precludes him from asserting a claim "arising from the decision of the newly elected officers of Local 57 not to retain him as a business agent after the trusteeship ended." Defendants' Br. at 9. Defendants are correct that the newly elected officers of Local 57 were free "to choose a staff whose views are compatible with [their] own." Finnegan, 456 U.S. at 441.

However, the analysis does not end there because, unlike in Finnegan, we are here concerned with a trusteeship that was created pursuant to Title III. Ross argues he is entitled to compensation because the continuation of the Trusteeship was in bad faith and for the purpose of removing him as political opposition within Local 57 in violation of S 304 of Title III.17  The Supreme Court

_____

17. There is some confusion about Ross' position regarding whether the Trusteeship was appropriately created and/or maintained. Defendants quote Ross as having conceded that the Trusteeship"was appropriate and was imposed for a proper purpose." See  Defendants' Br. at 2. However, we do not interpret Ross' testimony as a concession. Rather, he was asked if he was aware of the serious charges facing the officers of the union and whether such serious charges justify establishing a Trusteeship. He responded, "[w]ell, according to the International, that's the way they feel. But, I think we should have been spoke [sic] to first. . . . I do believe that is a valid reason for an International to come in and
take over." App. at 250. Ross did not necessarily concede, however, that

22

addressed a similar argument in the context of a trusteeship in Sheet Metal Workers' International Ass'n v. Lynn, 488 U.S. 347 (1989).

There, the trustee who had been appointed to run the local asked Lynn, who was an elected business representative of Local 75, to support a proposed dues increase. However, rather than support the increase, Lynn insisted that expenditures be reduced and he organized the opposition to the proposal to raise union dues. Id. at 349–50. Five days after the proposal was defeated, the trustee informed Lynn that he was being removed from his elected position of business agent. Id. at 350. Lynn exhausted his administrative remedies within the union, and then filed suit under Title I alleging that his removal constituted illegal retaliation in violation of the statutory right of free speech set forth in S 101(a)(2) of the LMRDA. 73 Stat. 519 S 101(a)(2), 29 U.S.C. S 411(a)(2).

The Court began its analysis by noting similarities between Lynn's plight, and the plight of the plaintiffs in Finnegan. The Court recalled that the Title I rights of the plaintiffs in Finnegan had been chilled"albeit indirectly, because [they] had been forced to choose between their rights and their jobs." Id., at 354. Nevertheless, the Finnegan plaintiffs had not recovered because the choice that they were left with did not violate the purpose of the LMRDA.

> Whether such interference with Title I rights gives rise to a cause of action under S 102 must be judged by reference to the LMRDA's basic objective: "to ensure that unions [are] democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." In Finnegan, this goal was furthered when the newly elected union president discharged the appointed staff of the ousted

_____

the actual motivation for taking over was the justification asserted by the
International. Moreover, even if he may have conceded the Trusteeship was established for a legitimate purpose, he clearly insists that it was maintained for an improper purpose, and that he has a cause of action under Title III as a result.

23

> incumbent. Indeed, the basis for the Finnegan holding was the recognition that the newly elected president's victory might be rendered meaningless if a disloyal staff were able to thwart the implementation of his programs. While such patronage-related discharges had some chilling effect on the free speech rights of the business agents, we found this concern outweighed by the need to vindicate the democratic choice made by the union electorate.

488 U.S. at 354-5 (citations omitted). However, the Court stressed that Lynn's situation was quite different for he was removed from an elected position, and his removal thereby had a direct impact on the democratic governance of the union itself.

> The consequences of the removal of an elected official are much different. To begin with, when an elected official like Lynn is removed from his post, the union members are denied the representative of their choice. Indeed, Lynn's removal deprived the membership of his leadership, knowledge, and advice at a critical time for

the Local. His removal, therefore, hardly was an integral part of ensuring a union administration's responsiveness to the mandate of the union election.

Furthermore, the potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him. Seeing Lynn removed from his post just five days after he led the fight to defeat yet another dues increase proposal, other members of the Local may well have concluded that one challenged the union's hierarchy, if at all, at one's peril. This is precisely what Congress sought to prevent when it passed the LMRDA. "It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal."

Id. at 355. Accordingly, the Court held that Lynn's allegation of retaliatory removal stated a cause of action under Title I of the LMRDA.

24

Ross was appointed and his complaint alleges only a violation of Title III.18 The Court in Lynn was quite explicit in tying Lynn's cause of action to Title I. The Court emphasized the importance of Title I as follows:

we find nothing in the language of the LMRDA or its legislative history to suggest that Congress intended Title I rights to fall by the wayside whenever a trusteeship is imposed. Had Congress contemplated such a result, we would expect to find some discussion of it in the text of the LMRDA or its legislative history. Given Congress' silence on this point, a trustee's authority under Title III ordinarily should be construed in a manner consistent with the protections provided in Title I.

Id. at 356-57.

Title I was enacted to protect rank-and-file members of the union and to insure union democracy by protecting the independence of elected union officials even though the free speech rights of the union's membership are implicated. This is true whether or not a trusteeship is involved. Ross tries to avail himself of the holding in Lynn by arguing that his removal has an impact on the democratic governance of the Local.19 He seems to be arguing that Title III was the

_____

18. Ross' brief states:

> As a result of the improper use of a trusteeship, Ross suffered direct
> or proximate damages. But for the imposition of the trusteeship,
> Ross still would be employed. Since the trusteeship was intended for
> an improper purpose and maintained in bad faith, the Defendants
> violated the LMRDA. Ross, as a member of Local 57, was "affected"
> by the violation of the LMRDA. The damages requested were
> "appropriate" to make him whole.

Ross' Brief at 23 (emphasis added).

19. Ross' brief states:

> The actions of the International Union will have also a chilling affect
> on all members of Local 57. If the International Union succeeds in
> destroying Ross and leaving him with no recourse, then other
> members will refrain from opposing the International Union. On the
> other hand, if the International Union is required to defend Ross'
> action and to compensate him for its misuse of the trusteeship, then

mechanism by which his free speech rights (i.e., Title I) were violated. However, the rights that may have been chilled are nevertheless Title I rights, not Title III rights. Therefore, the holding in Lynn does not further his position. "The potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him." Id. at 355. We are not persuaded by Ross' attempts to secure compensation for a claimed violation of Title I under Title III. His position is, in fact, in substantial tension with Finnegan. After all, in Finnegan, the Court allowed an appointed officer to be removed even though doing so required employees to chose between free speech and continued employment. The Court reasoned that choice was necessarily concomitant to allowing elected officials to implement the programs and leadership that a majority of the union membership had voted for. Although there was no issue of a trusteeship in Finnegan, it is very difficult to square that analysis with Ross' assertion that he has a cause of action because of the Trusteeship here.

As the Supreme Court found in the Title I setting,

nothing in the legislative history of Title III establishes that Congress intended to protect appointed officers like Ross under the circumstances here. Ross' reliance upon Title III may well be an attempt to circumvent the holding in Finnegan. But for the existence of the Trusteeship and the fact that Ross brought this suit under Title III, Finnegan would be more precisely on point. Ross' claim that he was victimized by an appointed Trustee rather than an elected officer does not alter the fact that the rights he seeks to vindicate are Title I rights, not Title III rights. Accordingly, we believe our analysis here must still be guided by Finnegan, and that is confirmed by our reading of Gesink v.

_____

> the International Union will think twice before using a trusteeship as a means to harm one of its members. In this respect, Ross' actions benefit all members and inure to the benefit of the `subordinate body of a labor organization' in addition to himself.

Ross' brief at 23 (emphasis added).

26

Grand Lodge, International Ass'n of Machinists and Aerospace Workers, 831 F.2d 214, 216 (10th Cir. 1987).

In Gesink, the International appointed a trustee who subsequently filed charges against Gesink, a business representative for the local. Id. at 215. Gesink was thereafter removed from his office by the president of the International, and he was barred from holding any office for five years. Id. Gesink sued for damages under Title I and Title III. His claim for damages under Title III was based upon his assertion that he was entitled to relief for deprivation of his salary and other emoluments of his office during the Grand Lodge supervision of the District Lodge. He argued that the supervision violated Title III of the LMRDA. Id. at 216. The Court dismissed his Title III claim stating:

> In light of the legislative history of Title III of the LMRDA and the Supreme Court's ruling in Finnegan , this Court finds that there is no cause of action for individual damages under SS 462 and 464. Any right of action pursuant to those sections belongs to the subordinate union, while a union member may sue to enforce the act's provisions, such suits should be limited to relief on behalf of the union. As the Supreme Court concluded in the Title I context, this Court concludes that nothing in the legislative history of Title III indicates an intent to protect the positions of union officers and employees.

Id., at 216. Similarly, in Pope v. Office and Professional Employees International Union, the court stated:"Title III of the LMRDA is designed to protect a subordinate union as a whole, whereas Title I . . . is designed to protect the individual rights of the members of a union." 74 F.3d 1492, 1504, (6th Cir. 1996).

The district court here found that Ross is not seeking compensatory damages and reinstatement in order to protect the local union and its membership from the actions of the Trustee. Rather, the court concluded that Ross sought relief to redress personal losses purportedly inflicted upon him by the Trustee. Ross v. Hotel Employees and Restaurant Employees Int'l Union, No. 98–1131, slip.

op. at 16–17 (W.D. Pa. Oct. 4, 1999). His efforts to now argue that his relief will benefit the union by vindicating its members' free speech rights is little more than a belated attempt to import considerations that govern Title I relief into a suit brought only under Title III.

Despite the holding in Finnegan, Lynn , and Gesink, Ross urges that we be guided by Higgins v. Harden, 644 F.2d 1348 (9th Cir. 1981). There, the International Association of Machinists ("IAM") appointed Simpson and Harden to exercise control over a local for which Higgins was an organizer. Thereafter, Harden attempted to remove Higgins from his position as organizer by claiming that Higgins had been unproductive. Higgins responded by suing under SS 101–611 of the LMRDA, 29 U.S.C. SS 401–531. He alleged that the IAM had imposed an unlawful trusteeship in the form of Simpson and Harden, that those trustees were without authority to terminate him, and that his termination had actually been in retaliation for his political support of the directing business representative of the local who had apparently fallen into disfavor with the International, and been "forced out" by Harden. Id.

The district court held that the International had, in fact, established a trusteeship. That trusteeship was declared invalid because the International had not complied with IAM's own constitution and bylaws. Accordingly, the court held that Harden did not have the authority to remove Higgins, and Higgins was awarded back-pay and attorney's fees. Id. The court of appeals affirmed that part of the district court's opinion. However, the court of appeals merely assumed that the requested individual relief was "appropriate" under Title III.

We decline to embrace Higgins for several reasons. Although the court there assumed that an individual right of action exists, under Title III, it did not directly address the issue. See Gesink, 831 F.2d at 216 (finding that the Higgins court "apparently assumes there is an individual right of action . . . but . . . does not discuss the issue"). It never analyzed the legislative history that Finnegan and Lynn instruct is so important to a proper inquiry. Moreover, Higgins was decided before Finnegan and Lynn, and the Higgins court therefore did not have the benefit of the

Supreme Court's discussion of the LMRDA contained in those later cases.

Ross also urges reliance on McDonald v. Oliver , 525 F.2d 1217 (5th Cir. 1976). In McDonald, new elections were held after a trusteeship was established, but the International invalidated the election results and refused to install the new officers. Id. at 1222–23. The newly elected officers brought suit under Titles I and III seeking to end the trusteeship; and win installation as officers, and back-pay. Id. The Secretary also brought an action under Titles III and IV based on a finding by a Labor Department official that the continuation of the trusteeship and the failure to recognize the election violated Titles III and IV of the LMRDA. Id. at 1224. The district court declared that the election was valid, ordered the immediate installation of the officers, and awarded back pay. Id. at 1225. The Court of Appeals affirmed, reasoning that:

> [a]lthough the primary purpose of an individual's lawsuit is obviously to vindicate his own rights or facilitate his own candidacy, there can be little doubt that he renders a substantial service to the union as an institution and to his members individually in protecting local democratic processes through Titles I and III. The successful litigant dispels the "chill" cast upon the rights of others.

Id. at 1227. The court also concluded that Title III should be "construed in light of the varius other provisions of the LMRDA." Id. at 1229. The court recognized that the primary purpose of the LMRDA is "not only to stop and prevent outrageous conduct by thugs and gangsters but also to stop lesser forms of objectionable conduct by those in positions of trust and to protect democratic processes within union organizations." Id. The court concluded by finding that the international union was thwarting union democracy in violation to the LMRDA.

Although McDonald suggests that a successful suit under Title III confers benefits on the entire union membership, the holding does not advance Ross' argument as much as he would like because McDonald was also decided before Finnegan and Lynn. Moreover, McDonald was elected and

Ross was appointed. The decisions in Finnegan  and Lynn readily establish the importance of that distinction and undermine McDonald as support for Ross' action under Title III.

Similarly, we find that Ross' reliance upon Pruitt v. United Brotherhood of Carpenters and Joiners of America, 659 F. Supp. 1511 (N.D. Ga. 1987), vacated on other gr'ds, 893 F.2d 1216 (11th Cir. 1990), is misplaced because Pruitt too is distinguishable from the instant case. There, the court was not asked to find a private cause of action for damages under S304 of Title III. Rather, Pruitt sued under both Title I and Title III alleging that an appointed trustee had prevented him from assuming an elected position in retaliation for the exercise of free speech. Id.  at 1514. The court discussed the statutory presumption of validity that attaches to trusteeships under S 304 of Title III in inquiring into whether the trusteeship in question had been imposed for a proper purpose. Id. at 1517, 1520. The issue addressed by the court was whether the "plaintiff 's Title III claims fail as a matter of law under the clear and convincing evidence standard [of S304]." Id. at 1519. The court merely ruled that "a triable issue may exist as to whether the trusteeship was maintained to block plaintiff from assuming his elected position" Id. at 1520. More importantly, Pruitt, unlike Ross, stated a Title I claim based upon his assertion that the trusteeship had precluded him from assuming an elected position. Id. at 1522.

Finally, Ross relies upon the decision of the Court of Appeals for the Sixth Circuit in Pope v. Office and Professional Employees International Union, 74 F.3d 1492 (6th Cir. 1996). Pope was an appointed business representative of Local 268 of the Office and Professional Employees International Union (OPEIU). Soon after his appointment, he alleged wrongdoing and mismanagement on the part of officers of Local 268. Id. at 1496. Support for Pope's outspoken criticism of the Local's leadership soon flourished, and he became a candidate for president of the Local despite opposition of the OPEIU, and local board. Id. at 1497. After one very chaotic meeting of the Local, the OPEIU granted the local board's request, and imposed a trusteeship to control Local 268 pending a hearing to

determine its propriety. Id. at 1498. Thereafter, the union held a hearing and determined that the trusteeship was appropriate despite Pope's protestations to the contrary. Shortly thereafter, Pope was fired, and his union membership was withdrawn without notice or opportunity to be heard. Id. at 1499. Pope was therefore ineligible to run for president of the Local. Elections were held, a new slate of officers was elected, and the trusteeship was thereafter terminated. Id. at 1500. However, before the trusteeship was terminated, Pope sued in district court.

Pope argued that the trusteeship violated Title III of the LMRDA, and that denying him eligibility to run for union office violated Title I of the LMRDA. Id. He sought monetary, declaratory and injunctive relief. However, after the elections took place the declaratory and injunctive claims were dismissed as moot. Id. The suit proceeded to trial, and the jury awarded Pope compensatory and punitive damages against the OPEIU. Id.

OPEIU appealed claiming that the LMRDA is designed to protect rank and file union members and not officers and employees and that Pope therefore lacked standing as an appointed employee. Id. at 1501. In resolving those issues, the Court reconciled the jury's verdict with the holdings in Finnegan, Lynn, and Gesink. The court also reconciled the jury's verdict with the holding in Cehaich v. International, UAW, 710 F.2d 234 (6th Cir. 1983), a case involving similar facts decided subsequent to Finnegan. Cehaich and Pope had both been appointed employees of local unions, but Cehaich's "status as a member of the union did not change after he was terminated from his appointed position. He was not fined, suspended, expelled or disciplined." Pope, 74 F.3d at 1502. The court reasoned as follows:

> In Finnegan, the appointed officials of an ousted board were not protected by the LMRDA because union members elected a new board. In Lynn, the elected officials were protected because they had been elected by the union members. The purpose of ensuring democracy is furthered by allowing Pope a cause of action under the LMRDA. Pope was appointed a business representative by an elected local executive board. That board was not ousted as in Finnegan .

> Moreover, unlike Cehaich, Pope was expelled from

> union membership immediately after his termination
> from his position as business representative. Thus,
> Pope's case is clearly distinguishable from Cehaich.
> Pope is entitled to protection under the LMRDA
> because he was disciplined in a manner which affected
> his right to fully enjoy the rights and privileges of
> union membership.

Id. at 1503.

However, most significantly for our purposes, the court
held that Pope's suit was not moot merely because the
trusteeship had since been terminated. The court reached
that result by reading Title I and Title III together and
concluding that "[t]he question of the propriety of the
trusteeship is not moot because it has direct bearing on
whether Pope's Title I rights were violated." Id. The violation
of Title III supported Pope's claim for damages because "[his
was] an action at law to recover damages for the
suppression of Title I rights as a result of the imposition of
a trusteeship." Id. at 1505.

However, Ross is not alleging a violation of Title I. He was
not expelled from membership, and he was reinstated to his
appointed position within 24 hours of being removed from
it.20 In reviewing the grant of summary judgment for the
defendants here, we must assume that they denied Ross'
eligibility to run for election solely to keep him from
running in the election. Although a union member's right to
seek elective office is protected under Title I, Id. at 1503;
Gesink, 831 F. 2d at 217, Ross seeks relief solely under
S 304 of Title III. Based on the text and legislative history of
Title III and the Supreme Court's decisions in Finnegan and
Lynn, we hold that Title III does not allow a private cause
of action for individual damages flowing from the
termination of an appointed employee. Relief underS 304

_____

20. We do not suggest that a union member must be stripped of his/her
union membership to state a cause of action under Title I or that prompt
reappointment will always insulate a defendant from claims of
retaliation. However, we do note that Ross does not argue that his
termination as an appointed officer was a scheme to suppress his
freedom of speech and assembly as a union member under Title I.

32

must be sought on behalf of the local union organization
and the entire membership must reap the benefits.

Accordingly, we conclude that the district court properly
determined that there was no genuine issue of material fact

and that, on the record before it, Ross' Title III claim failed as a matter of law. The relief Ross seeks is simply not "appropriate" within the meaning of Title III.

IV. Conclusion

For the reasons set forth herein, we conclude that the district court did not err in granting summary judgment to the defendants under Title III of the LMRDA and that order will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

33