

Villanova University School of Law Digital Repository

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-16-2004

# Morris v. Hoffa

Precedential or Non-Precedential: Precedential

Docket No. 02-1401

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Morris v. Hoffa" (2004). *2004 Decisions.* Paper 889.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/889

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

Nos: 02-1401/2214

JEAN MORRIS, PERSONAL
REPRESENTATIVE
OF THE ESTATE OF
JOHN MORRIS, DECEASED;[1]
KENNETH J. WOODRING;
ELMORE MACK; HAROLD FISCHER

v.

JAMES P. HOFFA, GENERAL
PRESIDENT, (individually and his
official capacity);
INTERNATIONAL BROTHERHOOD
OF TEAMSTERS

James P. Morris, Harold Fischer and
Elmore Mack
Appellants No. 02-1401

---

[1]John P. Morris died on March 28, 2002, after the district court proceedings but prior to argument on appeal. By Order dated August 28, 2003, we granted Jean Morris's motion for substitution pursuant to F.R.A.P. 43(a), for her late husband, appellant John Morris.

JEAN MORRIS, PERSONAL
REPRESENTATIVE
OF THE ESTATE OF
JOHN MORRIS, DECEASED;[2]
KENNETH J. WOODRING;
ELMORE MACK; HAROLD FISCHER

v.

JAMES P. HOFFA, GENERAL
PRESIDENT,
(individually and in his official
capacity);
INTERNATIONAL BROTHERHOOD
OF TEAMSTERS

James P. Hoffa and International
Brotherhood of Teamsters,

Appellants
No. 02-2214

On Appeal for the United States District
Court
for the Eastern District of Pennsylvania
(Civ. Action No. 99-5749)
District Court: Hon. John R. Padova

Argued: December 19, 2002

Before: SLOVITER and McKEE,
Circuit Judges,

---

[2]*See* n.1, *supra.*

1

and ROSENN, Senior Circuit Judge

(Opinion filed: March 16, 2004 )

---

JOHN F. INNELLI, ESQ. (Argued)
Innelli and Molder
325 Chestnut Street
Suite 903
Philadelphia, PA 19106
Attorneys for John P. Morris,
Elmore Mack and Harold Fisher

THOMAS H. KOHN, ESQ.
Markowitz & Richman
121 South Broad Street
Philadelphia, PA 19107

ROBERT M. BAPTISTE, ESQ. (Argued)
JAMES F. WALLINGTON, ESQ.
SUSAN BOYLE, ESQ.
Baptiste & Wilder, P.C.
1150 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20036
Attorneys for James P. Hoffa and
The International Brotherhood of
Teamsters

---

OPINION

---

McKEE, Circuit Judge.

These consolidated appeals arise from the imposition of an emergency trusteeship over Local 115 of the International Brotherhood of Teamsters ("IBT") by James P. Hoffa, General President of the IBT. The trusteeship was imposed pursuant to Title III of the Labor-Management Reporting and Disclosure Act ("LMRDA"), and it resulted in the subsequent removal of John P. Morris, Elmore Mack and Harold Fischer as elected officers of Local 115. Hoffa imposed the emergency trusteeship on November 15, 1999.

Morris, Mack and Fischer (collectively referred to as the "Morris Plaintiffs") filed suit three days after the trusteeship was imposed alleging that it violated various provisions of the LMRDA. The essence of their complaint was that Hoffa imposed the emergency trusteeship in retaliation for their opposition to Hoffa's bid for the presidency of the IBT in the 1996 and 1998 elections. Count One alleged that Hoffa imposed the emergency trusteeship for an invalid purpose in violation of Title III of the LMRDA, 29 U.S.C. §§ 462, 464, and the IBT's Constitution. Count Two alleged that Hoffa violated their rights to free speech guaranteed by Title I of the LMRDA, specifically 29 U.S.C. § 411(a)(2), and disciplined them for the exercise of their free speech rights in violation of 29 U.S.C. § 529. Count Three alleged that Hoffa breached the IBT's Constitution by imposing the emergency trusteeship over Local 115 in the absence of any colorable emergency, in violation of the LMRDA, 29 U.S.C. § 185.

A few days after the complaint was

2

filed, the temporary trustee appointed by Hoffa scheduled hearings as required by the IBT's Constitution. At the conclusion of the hearings, an internal union hearing panel issued a Report and Recommendation finding that there was sufficient reason for the imposition and continuation of the trusteeship. Hoffa adopted the panel's Report and Recommendation and continued the trusteeship on May 31, 2000. On June 13, 2001, Hoffa dissolved the trusteeship when newly-elected officers of the Local were installed.

In the meantime, Hoffa filed a motion for summary judgment, which the district court granted in substantial part. In its summary judgment opinion, the district court indicated that its disposition of Hoffa's summary judgment motion might warrant the entry of final judgment under Fed.R.Civ.P. 54(b). Accordingly, both sides filed Rule 54(b) motions. Hoffa also filed a motion for interlocutory appeal of a number of issues under 28 U.S.C. § 1292(b). Thereafter, the district court entered Rule 54(b) final judgment on Count Two (the free speech claim) in favor of Hoffa and against the Morris plaintiffs; entered Rule 54(b) final judgment on Count One with respect to the maintenance of the post-hearing trusteeship in favor of Hoffa and against the Morris plaintiffs, and entered Rule 54(b) final judgment on Count One with respect to the pre-hearing emergency trusteeship in favor of Hoffa but against Morris only. The district court also certified the following question of law for interlocutory appeal pursuant to § 1292(b): "Whether Plaintiffs have standing to recover for any damages on behalf of the Local Union 115 for the time period between the November 15, 1999 emergency imposition and the General President's May 31, 2001 decision issued after the hearing."

For the reasons that follow, we will affirm the district court's grant of summary judgment on Count Two in favor of Hoffa and against the Morris Plaintiffs. However, we will vacate the district court's entry of judgment under Rule 54(b) on Count One and direct the district court to enter summary judgment in favor of Hoffa and against the Morris Plaintiffs on their challenge to the prehearing emergency trusteeship. As we will explain, based upon this holding, we need not reach the issue of standing that the district court certified for interlocutory appeal.

## I. BACKGROUND

The IBT is an unincorporated association that is a labor organization within the meaning of § 2(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(b). Local 115 is a Pennsylvania unincorporated association and a labor organization under the NLRA. It is also a subordinate body of the IBT within the meaning of § 304 of the LMRDA, 29 U.S.C. § 464.

John P. Morris was the elected Secretary-Treasurer and principal officer of Local 115. Elmore Mack and Harold Fisher were elected trustees of the local.

All three were members of the Executive Board of Local 115 and constituted the majority of that Board under the Local's bylaws.

The IBT Constitution governs the relationship between the IBT and subordinate Local unions such as Local 115. James P. Hoffa was installed as General President of the IBT in mid-March, 1999, following a history of turmoil that culminated in a contentious 1998 election that was conducted under government supervision. Morris alleges that Hoffa initiated a campaign to oust Morris, as well as those in Local 115 who had been loyal to Morris, as soon as Hoffa took over.

On February 28, 1999, Brian Kada, a member of Local 115, had a conversation with Michael T. Breslin, Frank McGuire and Billy Anderson during which Kada told them that Hoffa had informed James E. Smith, Jr., a Morris foe, that Local 115 would be put under trusteeship. It is alleged that Kada also said that Morris would be out of office and that Hoffa wanted Morris's seats on the Philadelphia Regional Port Authority, the Joint Council 53 and the Pennsylvania Conference of Teamsters. Morris claimed that Smith would run Local 115 in return for Smith's assistance in ousting Morris.

According to Morris, Gerald McNamara had been communicating with Hoffa as early as March 15, 1999. McNamara was dissatisfied with Morris and was waiting to hear if Hoffa was going to place Local 115 in trusteeship.

Over the ensuing months, Smith and McNamara allegedly met with IBT representatives and agitated for a trusteeship, with Smith complaining to McNamara that the IBT was not moving fast enough. Morris claimed that Smith had been given target dates of April 1999 and then July 1999, for creating a trusteeship.

Hoffa and the IBT had received numerous complaints about the abuses that apparently characterized Local 115's leadership, and these allegations prompted an investigation of the local. According to Hoffa, information developed during that investigation revealed a "pretty frightening portrayal" of Local 115:

> We had these stories about beatings. Smith said he was beaten up in a stairwell, that Johnny Morris carries a gun, the local was buying guns. They had stun guns, they had pepper spray, unusual purchases for a local union, and things that are improper as far as I know, as far as I believe and we got that information and we acted on it.

App. at 53.

The investigation lead Hoffa to the conclusion that it was necessary to impose an emergency trusteeship over Local 115. Accordingly, on November 14, 1999, Hoffa appointed Edward F. Keyser, Jr.,

4

Temporary Trustee over the affairs of Local 115, effective November 15, 1999. That same day (November 14), Hoffa issued a Notice to the Officers and Members of Local 115, informing them of the reasons for the trusteeship.

The Notice specified sixteen reasons that included both general and specific instances of violence and intimidation under Morris's leadership dating back to 1955 and increasing in recent years. The intimidation included charges that Morris and his business agents threatened and assaulted disloyal members of Local 115, and that Morris had purchased materials such as stun guns to wage war against disloyal union members. Financial abuses were also noted, including a charge that Morris directed union members to perform "extensive renovations and repairs on [his] house" while still on the time clock for their employers; that Morris required stewards to collect cash gifts for himself in the form of annual "Christmas gifts," and that he retaliated against members whose Christmas spirit did not embrace extortionate gift giving. The fiscal abuses also included charges that Morris had altered Local 115's Health and Welfare Plan to suit his personal needs, and that he used union funds to benefit family members.

The November 14th notice and accompanying letters of appointment resulted in Keyser being given authority over all of the affairs of Local 115. It also resulted in the ouster of Morris, Mack and Fisher from their elected positions with the local. On November 22, 1999, Trustee Keyser issued a Notice of Trusteeship Hearing pursuant to the IBT Constitution, scheduling formal hearings on the need for a trusteeship for Thursday, December 9, 1999, and Saturday, December 11, 1999.[3]

## A. The Trusteeship Hearing.

According to Hoffa, a large conference room and a smaller office were made available to Morris's counsel and witnesses throughout the course of the ensuing hearings. Both rooms were adjacent to the membership hearing room, and they allowed Morris an opportunity for consultation and preparation. Hoffa claimed that the hearing panel kept the record open after the close of testimony so that the parties or any member could submit additional written testimony.

Trustee Keyser presented sixteen witnesses, including an IBT auditor and forensic auditors. Morris and his supporters presented twenty-five witnesses. Hoffa claims that approximately sixty members presented information during open microphone sessions that provided an opportunity for any member who wanted to address the panel to do so. Members also presented written statements, either directly to the panel, or through the Trustee, and then

---

[3] The hearings were postponed at Morris's request. Ultimately, they were rescheduled for January 5-7, 2000, and continued through January 19-21 and February 28 through March 3, 2000.

turned them over to the panel. The proceedings were transcribed and videotaped and both sides presented extensive briefs and proposed findings and conclusions of law.

Morris argues that the IBT caused more than 100 police officers to be placed outside the offices where the hearings were held. The police included SWAT team members in riot gear with face masks. People entering the offices had to walk a "gauntlet" of masked police officers, be searched, and pass through a metal detector. Morris claims that the IBT orchestrated this scene even though there was no indication of potential violence from Morris's supporters. Morris also claims that he was unable to obtain any evidence to contradict the evidence offered by Hoffa and the IBT because the emergency Trustee had sole possession and control of the books and records of Local 115. Morris alleges that he did not know in advance whom the Trustee would call as witnesses or what testimony the witnesses would provide.

Ironically, Morris apparently demonstrated his propensity for intimidation during the hearings. At one point, he became enraged at Local 115 President Smith. While Smith was testifying, Morris gestured as if he were loading and firing a shotgun at Smith's head. This caused the hearing to adjourn for the day. The following day when the hearing resumed, Morris denied making the gesture even though his actions had been captured on videotape.

Morris also apparently harassed, threatened and cursed any witness who opposed him, and he interrupted and talked over anyone trying to make a statement against him. In addition, former Business Agent Johnson sat next to Morris during the hearings and fulfilled the role of one of the "tough guys" that Morris reportedly always had with him. While sitting next to Morris, Johnson also threatened and cursed witnesses and the investigating panel.

The hearing panel's Report and Recommendation found overwhelming evidence to support the imposition and continuation of the trusteeship. The panel concluded that lifting the trusteeship would result in substantial damage to Local 115 and its members because Morris had created a climate of fear and intimidation that was irreparably destroying the rights of the membership.

## B. The IBT's Findings.

Hoffa accepted the panel's recommendation and continued the trusteeship. In doing so he wrote:

> During the eleven days of hearings, the longest running hearing ever conducted by the [IBT], numerous members appeared to testify about the events in the Local. Much of that testimony revealed a persistent pattern of abuse of power and suppression of membership rights. Quite simply, the evidence

6

established that supporters of the John Morris administration received special benefits and attention and those members who spoke or acted in a manner viewed as being hostile to the administration were abused, intimidated, retaliated against and even physically and economically endangered.

App. at 10.

Hoffa found evidence of several violent, verbal and physical attacks by Morris and other Local 115 officials against staff as well as union members. Morris had conducted abusive inquisitions and threatened union stewards. For example, union member Kada had been "sucker-punched" in the face by Business Agent "Jocko" Johnson on union property during a union meeting, in full view of Morris. Morris had then pushed Kada and baited Kada to push him back.[4]

The record contained substantial evidence of financial malpractice by Morris that Morris neither refuted nor explained. Morris used millions of dollars of Local 115's money to purchase and improve real estate, to purchase printing equipment, buses, a snowplow and vehicles that had no benefit to the members. Testimony from IBT auditor William Evans and forensic auditors Robert Walker and Joseph Wahl established that Morris purposefully failed to maintain required accounting records in order to hide much of his financial mismanagement. In addition, Morris falsified bank documents, commingled money from various Local 115 Funds and failed to file necessary tax documents.

Morris improperly used his authority to maintain control of Local 115. He placed members and their relatives in jobs and demanded loyalty in return for keeping their jobs. The members so placed were reportedly fired if Morris thought that they were disloyal to him. In addition, Morris arranged late night meetings where union members were abused, threatened and, in one instance, assaulted. Hoffa concluded that the officers of Local 115 did not properly represent these members.[5]

_____

[4]Morris's demeanor was often beyond bounds attributable to normal anger. He allegedly reinforced the intimidation by carrying a gun in the office in violation of the IBT Constitution.

_____

[5]The trustee's evidence established a complete breakdown of democratic rule within Local 115, and much of this evidence was almost entirely unrefuted. Morris did not deny requiring union members to do personal work for him or his relatives while they were "on the clock." Rather, he insisted that his position on the Joint Council entitled him to such services. In fact as noted above, it was corroborated by Morris's own conduct during the very hearings that were

7

The evidence also demonstrated that Morris had violated the IBT Constitution and federal law by consistently refusing to provide union members with copies of their collective bargaining agreements.[6]

The evidence confirmed that Morris had used the guise of "Christmas gifts" to extort money from members at some of the higher paying union shops as Hoffa had previously heard. Documents established that Morris had been embezzling money from the Union since 1981 when he awarded himself a raise without the required Executive Board approval. At the end of 1989, Morris further enriched himself by causing the Union to take out an insurance policy on his life under false pretenses.

Hoffa concluded that this evidence demonstrated that a trusteeship was absolutely necessary.

## II. DISTRICT COURT PROCEEDINGS

As noted above, the Morris Plaintiffs filed a complaint in the district court against Hoffa and the IBT challenging the imposition of the emergency trusteeship days after it was

_____

investigating claims of dictatorial control of Local 115.

[6] Members who attempted to participate in the preparation of proposals prior to contract negotiations were told to "shut up."

imposed.[7] In essence, the plaintiffs alleged that Hoffa imposed the trusteeship because they opposed him in the 1996 and 1998 IBT presidential elections. They claimed that Hoffa was attempting to suppress such opposition in the future.[8] As summarized above, Count One alleged that the trusteeship violated Title III of the LMRDA, 29 U.S.C. §§ 462, 464, and the

_____

[7] Originally, Kenneth Woodring, a union officer affected by the imposition of the trusteeship, was a plaintiff. However, he moved to dismiss all of his claims against Hoffa and the IBT pursuant to Fed.R.Civ.P. 41(a)(1).

[8] Morris claimed that Hoffa, an attorney, who until 1993 was never affiliated with the IBT, left the practice of law in that year to become the administrative assistant to the President of Teamsters Joint Council 43 for the sole purpose of running for the office of the General President of the IBT. Hoffa made his first unsuccessful attempt at the IBT's Presidency in 1996. Morris supported a slate opposed to Hoffa during 1996 election.

During the 1998 elections, Morris once again supported a slate opposed to Hoffa. Morris alleged that on May 3, 1998, William Walker, Sr., a retired Teamster and a Hoffa supporter, attended a Hoffa campaign fundraiser in Essington, Pennsylvania. Walker asked Hoffa what he intended to do about Morris if Hoffa was elected. According to Morris, Hoffa's reply was: "He's the first f....r to go when I get in."

8

IBT Constitution; Count Two alleged that Hoffa violated plaintiffs' right to free speech as guaranteed by Title I of the LMRDA, specifically, 29 U.S.C. §§ 411(a)(2), and § 29; and Count Three alleged that Hoffa breached the contract between the Local and the IBT, i.e., the IBT Constitution, by imposing the emergency trusteeship over Local 115 in the absence of any colorable emergency. Count Three further alleged that this also violated the LMRDA, 29 U.S.C. § 185. The plaintiffs sought various forms of injunctive relief, compensatory and punitive damages, and fees and costs.[9]

Hoffa filed an answer and a counterclaim. In his counterclaim, he requested judicial confirmation of the trusteeship under 29 U.S.C. § 464(c).[10] Following additional discovery, the district court granted Hoffa's motion for summary judgment in substantial part. In doing so, the court indicated that entry of final judgment qualifying for appeal pursuant to Fed.R.Civ.P. 54(b) might be warranted. *Morris v. Hoffa*, 2001 WL 1231741 (E.D.Pa. October 12, 2001). Following the court's thoughtful lead, Hoffa thereafter filed a motion for final judgment under Rule 54(b) and for

---

[9] The plaintiffs concede that the dissolution of the trusteeship on June 13, 2001 mooted the equitable relief sought in Counts One and Three.

[10] Hoffa concedes that the dissolution of the trusteeship moots his counterclaim.

interlocutory appeal under 28 U.S.C. § 1292(b). Morris filed a motion for final judgment pursuant to Rule 54(b) the same day.

On December 28, 1999, the district court granted Morris' motion for preliminary injunction, enjoining Hoffa and the IBT from exercising trusteeship over Local 115 and ordering Hoffa and the IBT to return control over Local 115 to its duly elected officers. The district court concluded that the information available to Hoffa and the IBT was insufficient to provide Hoffa and the IBT with a good faith belief that an emergency existed sufficient to warrant the imposition of an emergency trusteeship. *Morris v. Hoffa*, 1999 WL 1285820 (E.D.Pa. Dec. 28, 1999). Hoffa and the IBT appealed and this court stayed the injunction pending the appeal. During the pendency of the appeal, the IBT conducted the internal union hearing regarding the necessity for a trusteeship. As noted above, Hoffa, thereafter continued the trusteeship based upon the recommendation of the hearing panel. On June 12, 2000, we dismissed the appeal as moot because the internal union hearing had been conducted and Hoffa had ruled on the propriety of a trusteeship. *Morris v. Hoffa*, 2000 WL 33727939 (3d Cir. June 12, 2000).

On January 7, 2002, the district court entered final judgment on Count Two (the free speech count) in favor of Hoffa and against all plaintiffs; entered final judgment on Count One with respect to the maintenance of the post-hearing

9

trusteeship in favor of Hoffa and against Morris, Mack and Fischer; entered final judgment on Count One with respect to the emergency pre-hearing trusteeship in favor of Hoffa and against Morris only. As we noted at the outset, the court also certified the following question of law for interlocutory appeal pursuant to § 1292(b):

> Whether Plaintiffs have standing to recover any damages on behalf of the Local Union 115 for the time period between the November 15, 1999 emergency imposition and the General President's May 31, 2000 decision issued after the hearing.

*Morris v. Hoffa*, 2002 WL 15900 at \*7 (E.D.Pa. Jan. 4, 2002).[11]

Both the Morris Plaintiffs and Hoffa filed timely appeals.

### III. DISCUSSION

### A. The LMRDA

The LMRDA "was enacted [in 1959] in response to the perceived abuses that plagued labor relations and undermined public confidence in the labor movement." *Becker v. Industrial Union of Marine and Shipbuilding Workers of*

America, AFL-CI0, 900 F.2d 761, 766 (4th Cir. 1990). The legislation was an attempt to respond to abuses within the organized labor movement while "minimizing governmental interference with the internal affairs of labor organizations." *Id*. at 766-767. "Thus, while substantive abuses were to be addressed, the McClellan Committee recommended that any corrective legislation insure union democracy." *Id*. at 767 (citation and internal quotations omitted).[12]

Congress enacted Title III of the LMRDA to address problems related to imposition of trusteeships over local unions. *Id*.[13] In doing so, Congress was concerned with past abuses related to imposition of trusteeships, but it was also aware that "trusteeships are effective devices for maintaining order within labor organizations[]". *Id.* Thus, "the goals of the [LMRDA] were to be accomplished without emasculating the trusteeship as a

___

[11]The district court denied Hoffa's motion for § 1292(b) certification as to all other issues. *Id.*

[12] The Select Committee on Improper Activities in the Labor Management Field that was responsible for investigating abuses in organized labor and recommending remedial legislation is often referred to as the "McClellan Committee," after Senator McClellan, the Committee's chair.

[13]The legislative history of Title III is recited in detail in our opinion in *Ross v. Hotel Employees and Restaurant Employees International Union*, 266 F.3d 236, 245-249 (3d Cir. 2001).

10

control device."[14]  *Id.*

The LMRDA mandates that any trusteeship that is imposed conform to the constitution and bylaws of the union, and the purposes for which the trusteeship is imposed must be legitimate. *Id.* More particularly, § 302 of Title III of the LMRDA provides:

> Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.

29 U.S.C. § 462. Given the countless circumstances that might give rise to a trusteeship, "Congress specifically declined to attempt to detail all of the legitimate reasons for which a trusteeship might be imposed, leaving for the courts the development of common law limiting principles." *Becker*, 900 F.2d at 767-768 (citations omitted).

Congress also recognized that second guessing the judgments culminating in trusteeships could be both difficult and impractical. Accordingly, a presumption of validity attaches to trusteeships that are imposed for limited duration and in a manner consistent with the procedural mandates of the LMRDA. *Id.* at 768 ("Recognizing the delicate judgments which international officers are called upon to make in imposing a trusteeship and conscious of the relative inexpertness of outsiders, the [LMRDA's] guideline for evaluating a trusteeship supplies a presumption of validity, limited in duration, when certain procedural requirements are met.") (citation omitted). Title III of the LMRDA also provides:

> In any proceeding pursuant to this section a trusteeship established by a labor

---

[14]It has been noted that "[w]hile trusteeships are normally used by national unions to prevent or eliminate malpractices in subordinate organizations and as a tool of efficient union administration, they can be, and have been, used as a tool by which national officers suppress local autonomy over union activities." *J.D. Jolly v. Gorman*, 428 F.2d 960, 966 (5th Cir. 1970) (citing Levitan, *The Federal Law of Union Trusteeship,* in *Symposium, Labor-Management Reporting and Disclosure Act of 1959* (Slovekno, 1959)).

11

organization in conformity with the procedural requirements of its constitution and bylaws and *authorized or ratified after a fair hearing* either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was established or maintained in good faith for a purpose allowable under section 462 of this title.

29 U.S.C. § 464(c) (italics added).

A "fair hearing" requires notice and an opportunity to defend. *Becker*, 900 F.2d at 768.[15] "[T]he notice should set out in writing the factual basis for alleged violations of law or the union's constitution that justify imposition of a

---

[15]"Under the common law prior to the passage of the LMRDA, a trusteeship imposed upon a subordinate body was invalid unless the subordinate body was granted a fair hearing." *J.D. Jolly v. Gorman*, 428 F.2d at 967.

trusteeship." *Id.* (citations omitted). "The notice should also provide the date, time, and location of the hearing and indicate that the local will have the opportunity to respond to the charges." *Id.* (citation omitted). Courts do not, however, require any particular form of notice as long as the notice, together with any written communications supplementing it, inform those concerned of the date and time of the hearing. *Id.*

The international union seeking to impose the trusteeship must present sufficient evidence to justify a trusteeship at the hearing, and "[t]he local must be accorded the opportunity to cross-examine the international's witnesses and present rebuttal evidence." *Id.* at 769 (citations omitted).[16]

## B. The Morris/Mack/Fischer Appeal

## (No. 02-1401)

The Morris Plaintiffs argue that the IBT failed to conduct the fair hearing required to ratify and continue the trusteeship. They also claim that the trusteeship is little more than Hoffa's illegal retaliation for the exercise of their speech. We will discuss each claim

---

[16]Lack of counsel does not make a trusteeship hearing unfair because there is no right to representation by counsel at such a hearing. *See, e.g., Transport Workers Union of Phila. Local v. Transport Workers Union of Amer., AFL-CIO*, 2000 WL 1521507 at *2 (E.D.Pa. Sept. 29, 2000).

12

separately.

### (I). Did The IBT Conduct a Fair Hearing

### to Ratify and Continue the Trusteeship (Count One)?

The district court concluded that the Morris Plaintiffs failed to establish a genuine issue of material fact as to the unfairness of the hearing. Accordingly, the district court held that the post-hearing trusteeship met the requirements of 29 U.S.C. § 464(c) and was therefore entitled to a presumption of validity which went unrebutted. 2001 WL 1231741 at *6.

The district court considered allegations that the trusteeship was imposed in bad faith and for an improper purpose in violation of § 462. The court first concluded as a matter of law that a trusteeship is permissible if supported by a single proper purpose even if an improper purpose is also alleged.[17] *Id.* at *7. The court then considered the numerous justifications the hearing panel found that supported Hoffa's decision to continue the trusteeship. *Id.* Consequently, the district court granted summary judgment in favor of Hoffa and against The Morris Plaintiffs on Count One with respect to the post-hearing

---

[17]As noted, the alleged improper purpose was Hoffa's alleged vendetta against Morris, Mack and Fischer for their opposition to Hoffa in the 1996 and 1998 elections.

maintenance of trusteeship.

The court viewed Count One as asserting two separate claims – a pre-hearing emergency trusteeship claim and a post-hearing maintenance trusteeship claim. 2002 WL 15900 at *3 n.5. The court denied summary judgment to Hoffa on the pre-hearing emergency trusteeship claim because it believed a genuine issue of material fact existed as to whether the emergency trusteeship was initially imposed in accordance with the IBT constitution. 2001 WL 1231741 at *4.

However, because Morris was no longer a member of Local 115 when the district court disposed of Hoffa's summary judgment motions, the court found that he lacked standing to challenge the pre-hearing emergency trusteeship because any such claim would be limited to damages suffered by the Local. 2002 WL 15900 at *3 (citing *Ross v. Hotel Employees and Restaurant Employees International Union*, 266 F.3d 236, 249-50 (3d Cir. 2001)). Accordingly, the district court granted summary judgment to Hoffa only as against Morris on the pre-hearing emergency trusteeship claim. Mack and Fischer, although no longer elected officials of Local 115, are still members of the Local. The district court certified the issue of their standing to pursue a damage claim on the Local's behalf for interlocutory appeal under § 1292(b). (No. 02-2214).

Mack and Fischer do not contest the district court's ruling that a single proper purpose is sufficient to justify a

13

trusteeship even where improper purposes are alleged. Similarly, they do not attempt to refute the hearing panel's factual findings that there were numerous proper purposes for ratifying and continuing the trusteeship.[18] Rather, as we distill their argument, they appear to be claiming that there are genuine issues of material fact as to whether Hoffa and the ITB conducted a fair hearing to ratify and continue the trusteeship.

Initially, they claim that the hearing was unfair because its outcome was predetermined. According to Mack and Fischer:

> It is uncontroverted . . . that as of February 23, 1999, an agreement existed among supporters of James E. Smith, Jr., and Hoffa. Hoffa would use his authority as general president of the IBT to impose a trusteeship upon

Local 115, in exchange for which Smith, as ultimate successor to Morris, would permit Hoffa to control Local 115's seats on the Philadelphia Regional Port Authority, the Joint Council and the Pennsylvania Conference.

Appellants' Br. (No. 02-1401), at 14-15. They then argue that the district court held, in its preliminary injunction hearing, that Morris was likely to establish at trial that the information available to Hoffa when he imposed the emergency trusteeship was not sufficient to provide a good faith belief in the existence of an emergency. *See* 1999 WL 1285820 at *10. Thus, they claim that an inference can be drawn that Hoffa "would control the process of the hearing to ensure his desired outcome." Appellants' Br. (No. 02-1401), at 15. Accordingly, they maintain that the district court's failure to "submit this dispute to a factfinder constitutes reversible error." *Id.* at 16. We disagree.[19]

At the outset, the district court's grant of preliminary injunctive relief enjoining the imposition of the emergency trusteeship was not a merits disposition.

---

[18]The reasons for the continuation of the trusteeship included: "refusal to provide members of the Local with copies of their collective bargaining agreements; intimidation and physical attacks on members; financial abuse. . . missing assets; extortion of Christmas cash gifts; compelling members of the Local to do work that benefitted Morris and his relatives personally; and engineering of the termination of jobs of Local members who were perceived as disloyal." 2001 WL 1231741 at *7.

---

[19]We exercise plenary review of the district court's grant of summary judgment. *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 146 (3d Cir. 1993).

14

"[A] decision on a preliminary injunction is, in effect, only a prediction about the merits of the case." *United States v. Local 560, IBT*, 974 F.2d 315, 330 (3d Cir. 1992). Therefore, "a trial court, in deciding whether to grant permanent relief, is not bound by its decision or the appellate court's decision about preliminary relief." *Id.* Rather, the trial court "is free to reconsider the merits of the case." *Id.* Consequently, the district court's grant of preliminary injunctive relief does not suggest a genuine issue of material fact sufficient to preclude the grant of summary judgment.

Moreover, Mack and Fischer do not contest the district court's holding that the existence of a single proper purpose for the imposition of a trusteeship establishes the validity of the trusteeship, even where improper motives may exist. Thus, even if we assume *arguendo* that a Hoffa-Morris vendetta motivated Hoffa's efforts to oust Morris, Mack and Fischer from Local 115, we are still left with the district court's conclusion that the hearing panel found numerous proper justifications for imposing the trusteeship. Reasons, by the way, which Mack and Fischer do not even begin to dispute.

Moreover, the record does not support any connection between the alleged Morris-Hoffa vendetta, the imposition of a trusteeship and the allegation that Hoffa rewarded Smith with the presidency of Local 115. In their brief, Mack and Fischer argue that:

the evidentiary record

further establishes that Hoffa and the IBT conspired with James Smith to create an excuse to institute a trusteeship. In exchange for his assistance in ousting Morris, Smith was promised control over Local 115, and sure enough, that is exactly what happened.

Appellants' Br. (No. 02-1401), at 23. However, this claim ignores the fact that Smith was elected by secret ballot of the membership in an open and fair election. As noted above, Local 115 conducted elections for officers while this litigation was pending. A majority of the voting members, not Hoffa, chose Smith to be president of the Local. And, Hoffa alleges without contradiction that he played no role in the election. Hoffa's Br. at 23. Accordingly, we fail to see how an allegation that Hoffa promised Smith the presidency could defeat Hoffa's motion for summary judgment. While Mack and Fischer assert this "uncontroverted" agreement that Hoffa would make Smith the head of Local 115 in exchange for Smith's cooperation in ousting Morris, they concede that there is no record evidence that any such deal existed. Rather, their assertion rests on a rather ethereal inference. *See* Appellants' Br. (02-1401), at 7 n.3 ("Whether or not Hoffa actually promised Smith control over Local 115, as Brian Kada suggested [in the Breslin Declaration], *is not established*

15

*on the record below; however it is reasonable to infer that Smith received such a promise*"). (Emphasis added).

In any event, the Morris Plaintiffs appear to retreat from their claim that the outcome of any hearing was predetermined and instead now present two reasons for concluding that the hearing was unfair. First, they claim that they were unable to present an effective case and cross-examine witnesses because they did not have full access to Local 115's books and records. They claim that the books and records were in the custody and control of the Trustee after the imposition of the emergency trusteeship. Thus, they could not know which witnesses the Trustee would call each day at the hearing. Second, they argue that the police presence outside the union hall where the hearing was held was "*per se* intimidation, even for Teamsters," that biased the panel members by sending "a very clear message" to the panel that the charges had merit.[20] Appellants' Br. (No.

---

[20]Plaintiffs claim that the IBT's website reported: "Outside the hall, more than 100 law enforcement officers were on hand to ensure that the hearing proceeded without violence instigated by Morris supporters." Appellants' Br. (No. 02-1401), at 9 (citation omitted). They also say: "The IBT brought in these police officers, including armed police and SWAT team officers assisted by sharpshooters, canine officers and officers mounted on horseback. The police officers were clad in black riot gear, with

02-1401), at 17-18.

However, Mack and Fischer have waived their right to make these two arguments on appeal because they did not raise them in the district court. Rather, as the district court explained, the challenge to the fairness of the hearing was based on a claim that "(1) heavy police presence inhibited *members* from testifying;[21] and (2) [Morris, Mack and Fischer] were not allowed to have the assistance of counsel during the hearing."[22] 2001 WL 1231741

---

face masks. Persons entering the union hall had to walk a gauntlet of dozens of masked officers lined up in two columns, being searched and passing through a medical detectors." *Id.* (citation and internal quotations omitted). Mack and Fischer argue that the IBT caused this heavy police presence even though there was no indication for a potential for violence by Morris's supporters. Appellants' Br. (N002-1401) at 17-18.

[21]The district court held that the presence of police security at the site of the hearing did not by itself render the hearing unfair. 2001 WL 1251741 at *6 (citing *Chapa v. Local 18*, 737 F.2d 929, 933 (11th Cir. 1984).

[22]The district court held that there is no right to counsel at a trusteeship hearing. 2001 WL 1231741 at *6, and that is not contested on appeal. Furthermore, it appears from the transcripts of the hearing that Morris, Mack and Fischer were represented by

at \*6 (emphasis added). As a general rule, "absent compelling circumstances an appellate court will not consider issues that are raised for the first time on appeal." *Patterson v. Cuyler*, 729 F.2d 925, 929 (3d Cir. 1984), *overruled on other grounds recognized in Carter v. Rafferty*, 826 F.2d 1299 (3d Cir. 19987). Here, Mack and Fischer do not suggest any such compelling circumstances and we can think of none.

**(ii). IBT's Retaliation for Engaging in Protected Speech.**

In Count Two of their complaint, the Morris Plaintiffs alleged that Hoffa violated their rights to free speech under the Title I of the LMRDA,[23] 29 U.S.C. § 411(a)(2), and disciplined them for the exercise of those rights in violation of 29 U.S.C. § 529.

Section 101(a)(2) of Title I of the LMRDA provides:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and

---

counsel who participated in the hearing. Hoffa's Appendix, at 103-105.

[23]Title I of the LMRDA is referred to as the "Member's Bill of Rights." *See Farrell v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (Airline Division)*, 888 F.2d 459, 461 (6th Cir. 1989).

to express at meetings of the labor organization his views, upon candidates in an election of a labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2). Section 102 of Title I, 29 U.S.C. § 412, provides that any person whose rights have been infringed by a violation of § 101 may bring an action in the district court seeking such relief as may be appropriate. Section 609 of Title VI of the LMRDA prohibits certain kinds of discipline of a union member. It provides:

> It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a

labor organization, or any employee thereof to fine, suspend, expel or otherwise discipline any of its members for exercising any right to which he is entitled under the provision of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

29 U.S.C. § 529.

In their appeal from the grant of summary judgment on Count Two, the Morris Plaintiffs argue that the district court erred by holding that "*as a matter of law*, a determination that a presumption of validity attached to the continuation of a trusteeship pursuant to 29 U.S.C. § 464(c), precludes the violation of an individual union member's rights under 29 U.S.C. §§ 411 and 529." Appellants' Br. (02-1401), at 1 (emphasis in original).

However, that is not what the district court held. Rather, the district court held that the Morris Plaintiffs' nominal Title I claims were really a challenge to the validity of the trusteeship that must therefore be brought under Title III. The district court correctly characterized the Title I claims as follows:

Plaintiffs allege that "Defendants' *imposition of a purported 'emergency' trusteeship* over Local 115 was carried out in bad faith, as a political reprisal against the members of Local 115 for their vigorous electoral opposition to Hoffa's candidacy for General President and his policies." (Compl. ¶ 58 (emphasis added)). Plaintiffs further allege that "Defendants *imposed the trusteeship against Local 115* specifically to suppress the opposition policies, electoral activities and dissent of Plaintiff Morris and the Plaintiff elected members of the Local 115 Executive Board, to the policies and administration of Defendant Hoffa and the IBT" (Compl. ¶ 59 (emphasis added)); that "Defendants have *imposed the trusteeship* against Local 115 to undermine the credibility of the expected trial testimony of Plaintiffs Morris, Woodring and other members of Local 115 ..." (Compl. ¶ 60 (emphasis added)); and that "Defendants have *imposed the trusteeship* upon Local 115 in order to retaliate against the members of Local 115 and its elected officers, the Plaintiffs, for their past and current political opposition to the policies and administration

18

of Defendant Hoffa." (Compl. ¶ 61 (emphasis added).) Plaintiffs expressly cast their Title I claim as one "challenging the unlawful imposition of a trusteeship, not the job terminations of Plaintiffs." (Pls.' Mem. at 44- 45.)

2001 WL 1231741 at *10 (italics in original). The district court held that the claim was, in reality, "just another way of saying that the trusteeship was invalid because it was imposed for an improper motive." *Id.* The court then relied upon the reasoning in *Farrell v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (Airline Division)*, 888 F.2d 459 (6th Cir. 1989), in finding that challenges to the validity of a trusteeship must be raised under Title III, not Title I.[24]

---

[24]In *Farrell*, flight attendants claimed that the international union's imposition of a trusteeship immediately after they created their own local violated their Title I right to vote in local elections. However, they did not challenge the validity of the trusteeship under Title III. The court of appeals found that the flight attendants could not claim violation of their Title I rights by means of a trusteeship without first addressing the validity of the trusteeship under in an action under Title III. The court wrote: "Title III, not Title I, provides these

Consequently, the district court granted summary judgment to Hoffa on the Count Two claim.

For reasons not apparent to us, the Morris Plaintiffs do not address the district court's rationale for granting summary judgment to Hoffa on their Title I claim. In fact, they do not even mention that the district court dismissed their Title I claim as nothing more than a Title III attack on the validity of the trusteeship. Instead, they argue that their removal as officials of Local 115 for engaging in protected free speech constitutes retaliatory discipline in violation of 29 U.S.C. § 529. *See* Appellants' Br. (No. 02-1401), at 21 ("[R]emoval from *union office* for the exercise of protected speech. . .constitutes improper retaliatory discipline in violation of 29 U.S.C. § 529.") (emphasis added).

Even if we assume *arguendo* that Morris, Mack and Fischer were all engaging in protected speech and also assume that they were disciplined for doing so, their claim can still not survive our holding in *Sheridan v. United Brotherhood of Carpenters and Joiners of*

---

appellants with their appropriate remedy. A determination of the validity vel non of the trusteeship must precede any determination of the appellants' rights to hold local elections. If the trusteeship is a fraud, the statute provides a mechanism to prove it and thereafter recover their Title III rights. But, let them not put the cart before the horse." 888 F.2d at 462.

*America, Local No. 626*, 306 F.2d 152 (3d Cir. 1962). There we held that neither Title I nor Section 609 of Title VI (29 U.S.C. § 529) provide a remedy to a business agent who was removed from elected office prior to the expiration of his term. We stated that "[i]t is the union-member relationship, not the union-officer or union-employee relationship, that is protected." *Id*. at 157. We elaborated upon this in *Harrison v. Local 54 of the American Federation of State, County and Municipal Employees*, 518 F.2d 1276 (3d Cir. 1975):

> The union member is free to express views, arguments or opinions on matters of union business even if the expressions are libelous or malicious without fear of discipline. Conversely, the LMRDA does not provide relief to a union officer for suspension as an officer, nor for loss of income resulting therefrom. Nor does the Act provide relief from wrongful termination from employment. What is protected is the union-membership relationship.

518 F.2d at 1281 (3d Cir. 1975). Title I of the LMRDA therefore affords no remedy for any damages resulting from plaintiffs' removal as officers of Local 115.

The Morris Plaintiffs attempt to undermine this reasoning by arguing that the majority of appellate courts have held that retaliatory removal from union office for exercising Title I free speech rights violates 29 U.S.C. § 529. Appellants' Br (No. 01-1401). at 21 (citing *Bradford v. Textile Workers of America, AFL-CIO, Local 1093*, 563 F.2d 1138, 1141-1142 (4th Cir. 1977) (collecting cases and criticizing *Sheridan*)). They also argue that *Sheridan* "does not represent the [current] position of this court." Appellants' Br (No. 02-1401). at 22 n.7.

However, Sheridan has been followed in *Martire v. Laborers' Local Union 1058*, 410 F.2d 32, 35 (3d Cir. 1969), *Harrison v. Local 54*, 518 F.2d at 1281, and, most recently, in *Ruocchio v. United Transportation Union, Local 60*, 181 F.3d 376, 381 n.5 (3d Cir. 1999). Moreover, because *Sheridan* is the law of this circuit it controls our analysis notwithstanding any conflicting authority from other Circuit Courts of Appeals. *See Reich v. D.M. Sabia Co*., 90 F.32d 854, 855, n.2 (3rd Cir. 1996) ("It is the tradition of this court that a holding of a panel in a reported opinion is binding on subsequent panels.).

Nonetheless, a caveat is in order. In *Finnegan v. Leu*, 456 U.S. 431 (1982), the Supreme Court concluded that the language of §§ 411(a)(1) and (2) as well as Title I's legislative history established "that it was rank-and-file union members – not union officers or employees, as such – whom Congress sought to protect." *Id*. at 437. In dong so, the Court approvingly cited our decision in *Sheridan*. *Id*. at 438.

20

However, about seven years after *Finnegan*, the Court held in *Sheet Metal Workers' International Association v. Lynn*, 488 U.S. 347 (1989), that the removal of an *elected* business agent did violate Title I's free speech provisions. The Court distinguished between the removal of an appointed business agent, as occurred in *Finnegan*, and the removal of an elected business agent. The Court noted that when an *elected* official is removed from office, the membership is deprived of its representative of choice. *Id.* at 355. "[T]he potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him." *Id.* Accordingly, the Court held that the retaliatory removal of an elected official can be actionable under Title I. The Court also held that the removed official was not precluded from bringing a Title I action because he had been removed during a Title III trusteeship. *Id.* at 356 ("[W]e find nothing in the language of the LMRDA or its legislative history to suggest that Congress intended Title I rights to fall by the wayside whenever a trusteeship is imposed.'").

However, for reasons that are not apparent to us, the Morris Plaintiffs (who were elected officials of Local 115) do not rely upon *Sheet Metal Workers* to support their argument that their removal from elected office was improper retaliation in violation of their Title I free speech rights.

Moreover, the district court did not grant summary judgment to Hoffa on Count Two on the basis of *Sheridan.* Rather, as noted above, Hoffa was granted summary judgment because the district court held that plaintiffs' nominal Title I action was really a Title III challenge to the imposition of the trusteeship. The Morris Plaintiffs do not even discuss that issue. They do not even mention the Court's decision in *Sheet Metal Workers*. Therefore, we need not inquire into the impact, if any, that *Sheet Metal Workers* has on the continued validity of our holding in *Sheridan*.[25]

---

[25]Our decision in *Ross v. Hotel Employees and Restaurant Employees Int'l Union*, 266 F.3d 236, 257 (3d Cir. 2001), precludes the recovery of personal damages under Title III of the LMRDA by an appointed full-time salaried employee of a union flowing from the termination of his/her appointed employment. "Relief under [Title III] must be sought on behalf of the local union organization and the entire union membership must reap the benefits." *Id.* As noted in n.15, *supra*, the district court, on the basis of *Ross*, found that because Morris was no longer a union member, he could not pursue a damages claim on behalf of the Local for any damages the Local suffered as a result of the imposition of the pre-hearing emergency trusteeship. The district court further held that *Ross* precluded Mack and Fischer, who unlike Morris, were still union members, from asserting a claim for personal damages under Title III. 2002

## B. The Hoffa § 1292(b) Interlocutory Appeal

### (No. 02-2214).

We have already noted that the district court viewed the Count One challenge to the imposition of the trusteeship as two separate claims – a "pre-hearing emergency trusteeship" claim and a "post-hearing maintenance trusteeship" claim – and granted summary judgment to Hoffa on the post-hearing claim while denying summary judgment on the pre-hearing claim. The district court explained:

> This Court has previously concluded, at the preliminary injunction stage, that the evidence demonstrated a reasonable likelihood of proving that the information available to Hoffa at the time he decided to impose the emergency trusteeship was insufficient to provide him with a good faith belief in the existence of an emergency. This evidence creates a genuine issue of material fact under Rule 56 as to whether Hoffa imposed the emergency trusteeship in accordance with the IBT constitution. If Plaintiffs establish at trial that Defendants' imposition of the emergency trusteeship suffered from this procedural deficiency, Plaintiffs would then have the opportunity to proceed on the damages claim for the period between the defective imposition of the emergency trusteeship on November 15, 1999, and Hoffa's May 31, 2000 decision, based on the post hoc hearing, to continue the trusteeship. Accordingly, the Court denies the motion for summary judgment as to the emergency trusteeship period from November 15, 1999 to May 31, 2000.

2001 WL 1231741 at *4. The district court then limited any recovery to the damages suffered by Local 115. The court explained:

> Plaintiffs have not yet specified the nature of the compensatory damages sought under Title III. Plaintiffs may not, however, collect any personal

WL 15900 at *6. However, it also held that *Ross* did not address the issue of Mack's and Fischer's standing to recover damages on behalf of Local 115 from the imposition of the pre-hearing emergency trusteeship. *Id.* Consequently, it certified that issue for interlocutory appeal. *Id.*

damages for lost wages, loss of position, or any other individual damages on this portion of the Title III claim. The potential damage recovery on a Title III claim is limited to damages to the local union itself. *See Ross v. Hotel Employees & Restaurant Employees Int'l Union*, [266 F.3d 236 (3d Cir. 2001)]. The Court does not reach the question of Plaintiffs' entitlement to such damages on behalf of the local union.[26]

---

[26] Mack and Fischer appear to concede that they have yet to identify the nature of the damages they seek on behalf of Local 115. They argue that because *Ross* was decided during the pendency of the summary judgment proceedings, the "nature and quantum of damages is not part of the record on the motion for summary judgment." Appellees' Br. (No. 02-2214), at 13. Nonetheless, they assert that "the court [of appeals] can reasonably infer the nature, if not the quantum, of damages to Local 115 and its membership generally." *Id*.

However, it is not our function to "infer the nature" of their damages. Moreover, when Mack and Fischer do refer to their damages, it is clear that they are claiming personal Title I damages, not Title III damages to the local. For example, they quote the following from *Sheet Metal Workers Int'l Assn.*, 488 U.S.

at 355; "the potential chilling effect of Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him." Appellees' Br. (O2-2214), at 13. As another example, Mack and Fischer say the question of whether the manner in which Hoffa imposed the emergency trusteeship "resulted in a chilling effect on the membership of Local 115, and the extent of the damages sustained by the membership of Local 115 as a result thereof, is a question that is best left in the hands of the finder of fact." *Id*. at 15.

Admittedly, Mack and Fischer do make an allegation of appropriate Title III damages in a footnote in their brief. There they state:

> Title III damages in the case at bar involve, inter alia, transfer of at least one union shop organized by Local 115 to Teamsters Local 500, the Local of emergency trustee Edward J. Keyser, Jr., in exchange for his support. The membership fees of the transferred union shop are significant enough to justify the continued existence of Local 500, which was suffering a significant decline.

23

*Id.* at\*4 n.5.

At some point after a status conference and filing of memoranda, Morris conceded that he was no longer a member of Local 115. Accordingly, as we have noted, the district court found that since "[t]he parties agree that because Plaintiff Morris is no longer a member of the Local, he lacks standing to pursue a claim with respect to temporary trusteeship because such damages claim would be limited to damages on behalf of the Local." 2002 WL 15900 at \*3 (citing *Ross v. Hotel Employees and Restaurant Employees International Union*, 266 F.3d 236, 249-250 (3d Cir. 2001)).

Thereafter, the court certified only the aforementioned question of Mack's and Fischer's standing for interlocutory appeal. However, we need not answer the certified question because we agree with Hoffa that the district court erred by splitting the challenge to the imposition of the trusteeship into two separate claims. Under the plain language of § 464(c), the district court's holding on the validity of the post-hearing maintenance trusteeship necessarily established the validity of the pre-hearing emergency trusteeship. Therefore, Local 115 could not have suffered any damages from the imposition of the emergency trusteeship that was

---

*Id.* at 15 n.8. However, they never made this damages allegation in the district court, and it has therefore been waived.

continued following a fair hearing.

Section 304(c) of Title III of the LMRDA provides, in relevant part:

> In any proceeding pursuant to this section a *trusteeship established by a labor organization* in conformity with the procedural requirements of its constitution and bylaws and authorized or *ratified after a fair hearing* either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws *shall be presumed valid for a period of eighteen months from the date of its establishment* and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title.

29 U.S.C. § 464(c) (italics added). "Because the Act provides that a trusteeship may be 'authorized or *ratified* after a fair hearing,'. . ., a hearing meeting the requirements of the Act need not always precede the imposition of a trusteeship." *Becker*, 900 F.2d at 769 (citing 29 U.S.C. § 464(c) (italics in

24

original). Accordingly, "[p]ost hoc ratification of a trusteeship is consistent with the Act so long as the union's constitution provides for such a process, the ratification hearing otherwise meets the requirements of the Act, and the hearing follows the imposition of a trusteeship with reasonable promptness." *Id.* (citations omitted).

The district court found that "the post-hearing trusteeship meets the requirements of § 464(c) and is entitled to the statutory presumption of validity." 2001 WL 1231741 at *6. That presumption was not rebutted. The plain language of § 464(c) therefore compels a finding that the emergency trusteeship was valid. Section 464(c) expressly requires the presumption of validity of the trusteeship be effective "for a period of eighteen months from the date of its establishment." It also provides that the trusteeship "shall not be subject to attack during such period." Consequently, the eighteen month period of validity of the trusteeship cannot be construed to begin at the conclusion of the ratification hearing or at any time other than "the date of its establishment."

Here, the eighteen month period began on November 15, 1999, when Hoffa imposed the emergency trusteeship, and under the statute, it was not subject to attack during such time period. Therefore, Mack and Fischer are barred from bringing any action for damages on behalf of Local Union 115 for violations of Title III for 18 months following that date.

In opposing Hoffa's appeal, Mack and Fischer ignore the fact that the plain language of § 464(c) validates the pre-hearing emergency trusteeship absent sufficient evidence to overcome the presumption of validity. Instead, they argue that we cannot reach the validity of the pre-hearing trusteeship without improperly expanding the question certified for interlocutory appeal beyond the issue of standing. We disagree.

"Although the scope of review on an interlocutory appeal is generally constrained to the questions certified for review by the district court, *we may consider any grounds justifying reversal.*" *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1245 (3d Cir. 1994) (italics added). Moreover, "appellate jurisdiction [under § 1292(b)] applies to the order certified to the court of appeals and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996). Therefore, while we cannot "reach beyond the certified order to address other orders made in the case," we can "address any issue *fairly included* within the certified order." *Id.* (italics added). Here, our conclusion that § 464(c) necessitates a finding that the emergency trusteeship is valid is fairly included within the certified question of plaintiffs' standing to pursue a Title III claim for the period of the emergency trusteeship.[27]

_____

[27] We commend the district court on its handling of this complex and hotly

25

## IV. CONCLUSION

For all of the above reasons, we will affirm the district court's grant of final judgment under Rule 54(b) on Count Two to Hoffa and against the Morris Plaintiffs, However, we will vacate the district court's Rule 54(b) final judgments on Count One and remand with directions that the district court enter summary judgment on Count One in favor of Hoffa and against the Morris Plaintiffs. We will also remand for disposition of Count Three of the complaint.[28]

---

contested dispute, and on the precision and thoroughness of nearly all of its legal analysis. We disagree only with the court's decision to split Count One into two separate claims.

[28]In Count Three, the Morris Plaintiffs alleged that Hoffa and the IBT violated the IBT Constitution by imposing the emergency trusteeship over Local 115 in the absence of any colorable emergency, in violation of the LMRDA, 29 U.S.C. § 185. In Count One, they challenged the imposition of the emergency trusteeship on the grounds that it violated both Title III of the LMRDA and the IBT Constitution. In discussing Count One in its summary judgment opinion, the district court noted that, "[t]he provisions in the IBT constitution governing trusteeships closely track those in the LMRDA." 2001 WL 1231741 at *3. Therefore, it may well be that nothing remains of the Count Three claim given our holding that summary judgment should be granted to Hoffa and against the Morris Plaintiffs on the Count One claim. However, this is best resolved by the district court.